E. A. GREEN, N. W. Voight, E. M. Christianson, and F. D. Woodworth, Appellants, v. LYNN J. FRAZIER, Governor, William Langer, Attorney General, John N. Hagan, Commissioner of Agriculture and Labor, and Obert Olson, Treasurer of the State of North Dakota and the Industrial Commission of North Dakota, Respondents.

(176 N. W. 11.)

Constitutional law — where majority of qualified electors of the state approve an amendment to the Constitution and the same is ratified by the legislature and approved by the governor, it becomes part of the Constitution.

1. Where a proposed amendment to the Constitution of the state of North Dakota is, at a regular or special election, duly submitted to the electors for their approval, and a majority of the qualified electors voting at such election vote in favor of it, and it is later duly submitted to the legislature and by it agreed to and duly ratified, and it is thereafter approved by the governor of the state, it duly becomes a part of the Constitution of the state of North Dakota.

Constitutional law — all amendments which have been duly and legally adopted become a part of the Constitution.

2. It is *held*, the amendment to § 182 and to § 185 of the Constitution of the state of North Dakota each were regularly, lawfully, and in accordance with the provisions of the state Constitution relative to the amendment thereof, duly and legally adopted and are a part of the Constitution of the state of North Dakota.

Constitutional law — amendment of Constitution — right of people to amend same.

3. It is *held*, that the people of this state have the privilege, right, and authority, under the principles and prerogative of self-government, to adopt such Constitution and such amendments to it as to them may seem right and proper and best calculated to insure their general welfare, security, and

prosperity, subject, however, in this respect, to every limitation or restraint imposed upon them by the Constitution of the United States.

**Constitutional law — issuing bonds in the aid of public enterprises by the proper authorities of the state does not deny due process of law as guaranteed by the Federal Constitution.**

4. It is *held*, that neither of the amendments in question, in any manner, contravene any of the provisions of the Constitution of the United States; nor are they repugnant to it, nor are any of the laws relative to the construction and ownership of certain state-owned industries and utilities, invalid, void, or unconstitutional under the state Constitution; neither do they contravene any provision of the Constitution of the United States, nor are they within any of the restraints imposed by it upon the several states.

**State — issuing bonds by state — interference with private business.**

5. A private business or enterprise is one in which an individual or individuals, an association, copartnership, or private corporation have invested capital, time, attention, labor, and intelligence for the purpose of creating and conducting such business, for the sole purpose that those who make such contributions may, from the conducting and operating of it, make, gain, and acquire a financial profit, for their exclusive benefit, improvement, and enjoyment, and exclusively for their own private purposes and use.

**State — what constitutes public purpose of public business for which bonds of state may be issued.**

6. A public purpose or public business has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division, as, for example, a state, the sovereign powers of which are exercised to promote such public purpose or public business.

**State — the entering of the state into business enterprises which are for the benefit of its citizens is for a public purpose.**

7. It is *held*, that the building, owning, and operating of state-owned elevators, flouring mills, and other state industries in question, is for a public purpose as defined in paragraph 6, supra; it further appears that every resident and business in the state depends directly or indirectly upon the agricultural productions of the state for financial success, and that approximately 90 per cent of the wealth of this state is produced from the farms therein, and consists mostly of small grains, and, further, that great losses have been, and still are, being suffered by the farmers in marketing such grain outside the state, and that it is the purpose of such state-owned industries to establish a stable and fair market for such products within the state of North Dakota, where the producers of farm products within this state may receive the full market value of their products.

**Constitutional law — state owned industries — right to issue bonds.**

8. The building, owning, and operating of such state-owned industries and utilities being for a public purpose, and the profits from such inuring to all the people of the state, and are payable as such into the state treasury for the equal use and benefit of all the people of this state, it is *held*, that such ownership and operation of such industries and utilities constitute a public purpose, to carry out which the state may. issue bonds as prescribed by law, and may levy a tax on all property of this state not exempt from taxation under the laws of this state or of the United States, for the purpose of paying the principal and interest of such bonds; and that in levying and collecting of such tax there is no violation of either the state Constitution nor the Constitution of the United States nor the 14th Amendment.

**Constitutional law — fixing rate of interest not delegation of legislative power.**

9. It is further *held*, that the authorization of the governor and industrial commission to fix the rate of interest, date of maturity, etc., of such bonds, is not the delegation of a legislative power or function, but merely the conferring of administrative duties upon them.

**Constitutional law — amendments to Constitution promoting home ownership are valid.**

10. The constitutional amendments and laws in question promote home ownership. The state, as such, is made up of units. Those units are represented by homes. The more homes, the more prosperous and secure they are, the more prosperous, secure and permanent is the state. The state, its integrity, morality, intelligence, prosperity, and permanence is measured largely by the average of those same virtues in its citizenship, and those virtues are greatly promoted by permanency of home ownership, which the laws in question are intended to establish.

Opinion filed January 2, 1920.

Appeal from the District Court of Burleigh County, Honorable *W. L. Nuessle,* Judge.

From an order sustaining a demurrer to the complaint plaintiffs appeal.

Order affirmed.

*Harry Lashkowitz,* for appellants.

"When a government becomes a partner in any trading company it devests itself, so far as concerns the transactions of that company, of its sovereign character and takes that of a private citizen. Instead of

communicating to the company its privileges and prerogatives, it de-scends to the level with those with whom it associated, and to the business which is to be transacted. . . . The government by becoming a co-operator lays down its sovereignty so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter." United States v. Planters Bank, 9 Wheat. 905; Osborne v. United States, 9 Wheat. 240; Bank v. Whister, 2 Pet. 318; Bank v. Ashley, 2 Pet. 328; Darrington v. State Bank, 13 How. 12; Briscoe v. Bank of Kentucky, 7 Pet. 257; Curran v. Bank of Arkansas, 15 How. 304.

Taxation, except for public purposes, would be in violation of the 14th Amendment of the Federal Constitution. Loan Asso. v. Topeka, 20 Wall. 655; State v. Nelson County, 1 N. D. 96; Manning v. Devils Lake, 13 N. D. 47; Jones v. Portland, 245 U. S. 220; Cole v. La-Grange, 113 U. S. 1; Parkersburg v. Brown, 106 U. S. 487; Dodge v. Township, 107 Fed. 827; 2 Dill. Mun. Corp. 738 (587); 2 Beach, Pub. Corp. § 1440; Lowell, v. Boston, 111 Mass. 454, affirmed on appeal to the Supreme Court of the United States.

The doctrine of the Massachusetts case was approved in the cases of Loan Asso. v. Topeka, 20 Wall. 654; Whitney v. Fon du Lac, 25 Wis. 188; Olcott v. Supervisors, 16 Wall. 689; People v. Salem, 20 Mich. 452; Jenkins v. Andover, 106 Mass. 94; Cooley, Const. Lim. 129, 174, 487; Rippe v. Becker, 57 N. W. 331; Davies v. State, 78 N. E. 995; Hackett v. Ottawa, 99 U. S. 86; Re Opinion of Justices (Mass.) 98 N. E. 611.

"The legislature has no rightful power to impose taxes on the people for any other than a public purpose. It is not legal taxation if the power is exercised for the benefit of private persons, or in aid of private uses and enterprises, even where there is no express constitutional prohibition." 37 Enc. Law, 721.

It is not sufficient to justify such taxation, that the private enterprises made incidentally or indirectly inure to the public benefit. Ibid.; Deal v. Mississippi, 18 S. W. 24.

When the expression is used that the property must be used for a public purpose, it is meant "governmental purpose." Covington v. Kentucky, 173 U. S. 237; Loan Asso. v. Topeka, supra.

It is not sufficient to justify such taxation, that the private enterprises may incidentally or indirectly inure to the public benefit. 37 Enc. Law 721; Deal v. Mississippi, 18 S. W. 24.

The words "public purpose" mean "governmental purposes." Covington v. Kentucky, 173 U. S. 237.

*William Langer,* for respondents.

An act of the lawmaking power will not be held unconstitutional unless it is clearly and palpably so; all reasonable presumptions are to be indulged in favor of the constitutionality of the given act. Laughlin v. Portland, 111 Me. 486, 90 Atl. 318.

"The determination by the legislature that the use for which property is authorized to be taken is a public one is, undoubtedly, subject to review by the court. But all reasonable presumptions are in favor of the validity of such determinations by the legislature, and the act must be regarded as valid unless it can be clearly shown to be in conflict with the Constitution." Jones v. Portland, 235 U. S. 217; Union Lime Co. v. Chicago R. Co. 223 U. S. 211.

A decision of the highest court of a state declaring a use to be public in its nature would be accepted unless clearly not well founded. Falbrook Irrigation v. Bradley, 164 U. S. 112; Clark v. Nash, 198 U. S. 361, 389; Strickley v. Hyland Boy Min. Co. 200 U. S. 527; Offield v. New York R. Co. 203 U. S. 272–277; Hairston v. Danville, etc. R. Co. 208 U. S. 598–607.

"As the terms are used in reference to taxation, what is for the 'public good,' and what are 'public purposes,' and what does constitute a 'public purpose,' are questions which the legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which cannot be controlled by the courts, except perhaps where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful." Walker v. Cincinnati, 21 Ohio St. 14; Jarrott v. Moberly, 13 Fed. Cas. 366, 367.

"Courts cannot say that a statute authorizing a city to borrow money, etc., for building a railroad to be owned by it, is not for a 'public purpose.'" Walker v. Cincinnati, 21 Ohio St. 14, 42, 8 Am. Rep. 24; Saunders v. Arlington, 147 Ga. 581, 94 S. E. 1022, decided in Jan. 1918; Andrews v. South Haven, 187 Mich. 294, 153 N. W.

827; Louisiana in Union Ice & Coal Co. v. Ruston, 125 La. 898, 66 So. 262.

"Where a statute may or may not be in violation of constitutional rights according to circumstances, in the absence of a countershowing, the existence of circumstances necessary to support it will be presumed." Boutwell v. Champlain Realty Co. 89 Vt. 80.

*William Lemke* (*W. S. Lauder, S. L. Nuchols,* and *Frederic A. Pike,* of counsel) also for respondents.

GRACE, J. This action was commenced by the plaintiffs, in the county of Cass, to procure an injunction to restrain the defendants, each of whom is a state officer of the state of North Dakota, from disbursing certain public funds in the state treasury, aggregating perhaps several hundred thousand dollars; and, further, to restrain the defendants from issuing certain state bonds, and to have declared invalid, null and void, certain amendments of the state Constitution, and certain statutes authorizing the disbursing of such money, and the execution, sale, and delivery of such bonds. The venue of the action was changed by a proper order to the county of Burleigh.

The plaintiffs are taxpayers of this state, and as such bring this action. The decisions in this case, in so far as it interprets the provisions of the Constitution and laws of this state, will be binding upon not only these taxpayers, but all others of this state.

At a general election in this state, there were ten proposed constitutional amendments to the Constitution of the state of North Dakota, legally submitted to the electors for adoption or rejection. Each of them received a majority of the votes cast at such election, and thus they were duly adopted by the electors. They were then duly presented to the legislature of the state of North Dakota, and, by resolution of the House of Representatives of the state of North Dakota, the Senate concurring, agreed to and declared a party of the Constitution of the state, and each of said amendments was duly adopted, and thus became effective as part of the Constitution of the state of North Dakota.

The validity of two of such constitutional amendments is challenged by this action, and claimed, thereby, to be null and void.

Section 182 of the Constitution, prior to its amendment, is as fol-

lows: "The state may, to meet casual deficits or failure in the revenue or in case of extraordinary emergencies contract debts, but such debts shall never in the aggregate exceed the sum of $200,000, exclusive of what may be the debt of North Dakota at the time of the adoption of this Constitution.

"Every such debt shall be authorized by law for certain purposes to be definitely mentioned therein, and every such law shall provide for levying an annual tax sufficient to pay the interest semiannually, and the principal within thirty years from the passage of such law, and shall specially appropriate the proceeds of such tax to the payment of said principal and interest, and such appropriation shall not be repealed or the tax discontinued until such debt, both principal and interest, shall have been fully paid.

"No debt in excess of the limit named shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war, or to provide for public defense in case of threatened hostilities; but the issuing of new bonds to refund existing indebtedness, shall not be construed to be any part or portion of said $200,000."

As amended, § 182 is as follows:

"The state may issue or guarantee the payment of bonds, providing that all bonds in excess of $2,000,000 shall be secured by first mortgages upon real estate in amounts not to exceed one half of its value; or upon real and personal property of state-owned utilities, enterprises or industries in amounts not exceeding its value, and, provided further, that the state shall not issue or guarantee bonds upon property of state-owned utilities, enterprises or industries in excess of $10,000,000.

"No future indebtedness shall be incurred by the state, unless evidenced by bond issues, which shall be authorized by law for certain purposes, to be clearly defined.

"Every law authorizing a bond issue shall provide for levying an annual tax, or may make other provisions, sufficient to pay the interest semiannually, and the principal within thirty years from the passage of such law, and shall specially appropriate the proceeds of such tax, or of such other provisions, to the payment of said principal and interest, and such appropriation shall not be repealed nor the tax or other

44 N. D.—26.

provisions discontinued until such debt, both principal and interest, shall have been paid.

"No debt, in excess of the limit named herein shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war or to provide for the public defense in case of threatened hostilities."

Section 185 of the Constitution, before its amendment, is as follows: "Neither the state nor any county, city, township, town, school district or any other political subdivision shall loan or give its credit or make donations to or in aid of any individual, association or corporation, except for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation, nor shall the state engage in any work of internal improvement, unless authorized by two-thirds vote of the people."

As amended, the section is as follows: "The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by article 20 of the Constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation."

The specific laws claimed by the plaintiff to be unconstitutional, void and of no effect, and which were enacted by the 16th legislative assembly, are as follows:

House Bill 17, the Industrial Commission Act; House Bill 18, Bank of North Dakota Act; House Bill 49, Bank of North Dakota Bond Act; Senate Bill 130, Bank of North Dakota, Real Estate Act; Senate Bill 20, the Mill and Elevator Association Act; Senate Bill 75, the Mill and Elevator Association Bond Act; Senate Bill 19, the Home Building Act.

The Industrial Commission Act created and established the industrial commission, the duties of which are to conduct and manage, on behalf of the state of North Dakota, certain state utilities, industries, enterprises, and business projects, then and thereafter established by law. Numerically, the industrial commission consists of three mem-

bers, and its personnel is the governor, the attorney general, and the Commissioner of Agriculture and Labor, of the state of North Dakota. Its powers and duties are defined by the act creating it.

"The Bank of North Dakota Act" is one declaring the purpose of the state of North Dakota to engage in the banking business, and establishing a system of banking, under the name of "the Bank of North Dakota," operated by the state. The act defines the scope and manner of its operation, and the powers and duties of the persons charged with its management.

The powers, duties and privileges of "the Bank of North Dakota" are fully set forth in the act creating it, and its operation, management and control are, by the act, committed to the industrial commission.

"The Bank of North Dakota Bond Act" is one providing for the issuing of bonds of the state of North Dakota, in the sum of $2,000,000; such bonds to be known as "Bonds of North Dakota, Bank Series." In this act, the terms of the bonds are prescribed, and the purposes set forth. It provides a tax, and *makes other provisions for the payment thereof*. We shall have occasion to refer to this act, later in the opinion.

"The Bank of North Dakota, Real Estate Series," is one providing for the issuing of bonds of the state of North Dakota, in a sum not exceeding $10,000,000, to be known as "Bonds of North Dakota, Real Estate Series." It prescribes the terms and states the purposes of the act; it provides for a tax, and *makes other provisions for the payment of the bonds,* both principal and interest.

"The Mill and Elevator Association Act" is one declaring the purpose of the state of North Dakota to engage in the business of manufacturing and marketing of farm products, and for establishing a warehouse, elevator, and flour-mill system, under the name of "North Dakota Mill and Elevator Association,"—all to be operated by the state. The act clearly defines its purpose, method, and manner of operation. Its purpose is declared to be the encouraging and promoting of agriculture, commerce, and industry, by the state engaging in the business of manufacturing and marketing of farm products. The management, operation, and control of the association is placed with the industrial commission, by the provisions of the act.

The business of the association is declared by the act to include the doing of anything that a private individual or corporation may lawfully do in conducting a similar business, subject, however, to such restrictions as are contained in the act.

"The Mill & Elevator Association Bond Act" is one providing for the issuing of bonds of the state of North Dakota, in a sum not exceeding $5,000,000, to be known as "Bonds of North Dakota, Mill and Elevator Series." The act prescribes the terms of the bonds and states the purposes thereof. It provides for a tax, and *makes other provisions for the payment thereof,* in the manner specified in the act. It makes appropriations and other provisions for the payment of interest and principal of the bonds, and to carry into effect the provisions of the act.

"The Home Building Association of North Dakota Act" is one declaring the purpose of the state to engage in the undertaking of providing homes for residents of this state. *Its purpose is the promotion of home building and home ownership by residents of this state.* The purpose of the act is to establish a business system, operated by the state, under the appellation above mentioned, and for the purposes mentioned in it. It prescribes the powers and duties of the persons charged with its operation and management, and provides for an appropriation to carry its provisions into effect. The management of the business of the association is, like the other state industries, placed with the industrial commission.

The powers and duties of the association, and the manner of conducting the association, are prescribed in the act. To accomplish the purposes of the act, and to carry out its provisions, the industrial commission is empowered to acquire by purchase, lease, or by the exercise of the right to eminent domain, in accord with the provisions of chapter 36, Code of Civil Procedure, Comp. Laws 1913, requisite property or property rights, and is authorized to construct, repair, and remodel buildings, having strict regard for economy in the administration of its affairs.

Under the act, no home may be built, purchased, or sold at a price which exceeds $5,000, except in the case of a farm home, where the selling price shall not exceed $10,000. The foregoing is a short

synopsis of the laws, the validating of which is called in question in this case. As we proceed with the discussion of the objection of plaintiffs to such laws, we will refer to other provisions in them, or some of them, in a more specific manner.

The objections of plaintiffs to the constitutional amendments, and to the laws in question, may be stated in the order of their importance, under four heads:

(1) That such laws are unconstitutional in that no sufficient provision is made in them for a sinking fund, to meet and pay the principal of the bonds to be so issued, and the interest thereon, as required by § 182, Constitution of the state of North Dakota.

(2) That the acts are invalid, for the reason that the legislature did not exercise its function of fixing the amount, denomination, date of maturity, and rate of interest on the bonds; but that it delegated such legislative function of fixing and determining those matters, to the governor and the industrial commission.

(3) That all the bonds are issued in furtherance of private business, and not for public purposes.

(4) That, by reason of the plaintiffs being required to pay taxes, which will be used to pay the principal and interest on the bonds, in the manner prescribed by the various acts, and by the creation of the obligations to be evidenced by the bonds, the plaintiffs, so they claim, will be deprived of their property, without due process of law, all of which they claim is in violation of the 14th Amendment to the Federal Constitution.

Adverting to the first objection, it may be noted that it must be considered, in the light and according to the provisions of § 182 of the state Constitution, as amended, and not by its provisions as it originally existed prior to the amendment.

In the case of State ex rel. Langer v. Hall, post, 536, 173 N. W. 763, this court construed § 182 as amended. In that case this court held that, under that section as amended, the state was duly authorized to issue $2,000,000 of bonded indebtedness, unsecured except by the faith and credit of the state of North Dakota, in addition to the $412,000 of the then existing bonded indebtedness of the state.

The effect of that decision was to sustain and uphold the validity of § 182 as amended. This court is one of last resort, for the purpose of determining the validity of the provisions of the state Constitution, and the statutes and laws of the state enacted in harmony therewith.

The powers of this court in this regard are exclusive and unlimited, except as to the question whether such constitutional provision or statute is violative of any of the provisions of the Federal Constitution.

This doctrine has been universally recognized by the Federal courts, including the Supreme Court of the United States. Neither of the provisions of the state Constitution under consideration in this case, nor any of the laws drawn in question, which are above enumerated, violate any of the provisions of the Federal Constitution.

Later in the opinion, we will further discuss the constitutional provisions in question. There remains, so far as this objection is concerned, only the question of whether or not § 182 as amended has provided a method for the payment of the principal of the bonds at their maturity, and the interest thereon at the time of its accrual.

An examination of § 182 as amended will disclose that it requires that every law authorizing a bond issue shall provide for levying an annual tax, *or make other provision, sufficient to pay the interest, semiannually, and the principal within thirty years from the passage of the law.* It further provides that the proceeds of such tax or other provision shall be specifically appropriated to the payment of the bonds and interest, and such tax or other provisions cannot be repealed until such bonds and interest have been paid.

Then, we see, § 182 as amended, in a most particular manner, provides a method for the payment of any bonds and the interest thereon, issued under the authority contained in said section as amended, and most specifically, by two methods, provides for the accumulation of moneys into special or sinking fund, to pay and retire the bonds, at their maturity, as well as to pay the accrued interest on them when due.

Keeping in mind that it is the purpose of the state of North Dakota to engage in the banking business, and, in pursuance of said purpose, has established a system of banking, under the name of the "Bank of North Dakota," and that the legislature, in consonance with the pro-

visions of the Constitution and laws of the state, has authorized the issue of the $2,000,000 of bonds, secured only by the faith and credit of the state, for the purpose of furnishing capital to the "Bank of North Dakota," and that such bank is a state industry or institution, we may, then, inquire what provision has been made, by law, in compliance with the constitutional requirement, under consideration, with reference to the payment of the principal of such bonds, and the interest, which may accrue upon them.

The act authorizing such bonds, in § 6 provides that "at the time of each annual meeting of the state board of equalization hereafter, the industrial commission shall deliver to said board an exact written statement of all bonds issued under the provisions of this act outstanding at that time, including therein the dates of maturity, interest rates and all other information proper to enable the board intelligently to comply with the provisions of this act in regard to tax levies.

"On the basis of such information the state board of equalization shall annually levy a tax, at the time other taxes are levied, sufficient in amount to pay such interest on said bonds as will become due during the year beginning on the next ensuing first day of January, and said tax shall be collected in the same manner as other state taxes are collected." [Laws 1919, p. 206.]

Section 2 of the act we are considering provides that the bonds must "be payable in not less than ten nor more than thirty years from the passage of this act."

Section 7 of the same act provides that "whenever it shall appear to the board of equalization from the information contained in any statement delivered to it by the industrial commission at any annual meeting of said board [of equalization] as provided by § 6 above, that there will mature, within a period of five years from such annual meeting, any of the bonds provided for in this act, the board of equalization shall thereupon, at such annual meeting, levy a tax, in an amount equal to one fifth of the amount of the principal of such bonds."

The board of equalization, however, in determining the amount of such tax, shall take into account whatever moneys, if any, shall have been paid to the state treasurer by the industrial commission, for the specific purpose of paying the principal of said bonds, and interest when due, as provided in § 5 of this act.

The board of equalization shall apply to the state treasurer for information as to the amount of such moneys, and as to the times when paid to him. If the amount of such moneys paid to the treasurer, since the date of the last preceding tax levy made by the board of equalization, shall equal or exceed one fifth of the amount of the bonds, so to mature, then such tax shall not be levied; but if the amount of such moneys paid to the state treasurer since the date of the last preceding tax levy shall be less than one fifth of the amount of said bonds and interest so to mature, then the board of equalization shall deduct the amount of such moneys so paid from such one fifth of such bonds, and shall levy the tax hereinbefore in this section provided, for the difference. It is the intention of this section to provide that in each of the last five years, before the maturity of any of said bonds, a state tax shall be levied, which, together with such moneys as shall, during the next preceding year, have been paid to the state treasurer by the industrial commission for the purpose, shall be at least sufficient to pay one-fifth part of the principal of said bonds.

Thus, by taxation, is provision made for the payment of the interest on the bonds, and the payment of the principal.

The second method for the payment of the principal and interest of the bonds in question is by the earnings of the "Bank of North Dakota." In order to have some definite idea about its earnings, it may be well to know something of its resources for transacting business.

First, it has a capital of $2,000,000, derived from the bond issue. Section 7 of chapter 147—this is House Bill No. 18, which in creating the bank—provides that all state, county, township, municipal, and school-district funds, and funds of all penal, educational, and industrial institutions, and all other public funds, shall be, by the person having control of such funds, deposited in the "Bank of North Dakota," within three months from the passage and approval of the act, subject to disbursement for public purposes, on checks drawn by proper officials, in the manner now or hereafter provided by law.

It is a matter of common knowledge, as it also appears from the records of the bank, that its resources, including the deposit of such public funds, are approximately $17,000,000; it is also by law authorized to receive deposits from other sources, including deposits from the

United States government; it is authorized by law to perform the functions and render the services of a clearing house, and is authorized to deal in exchange, both domestic and foreign, and is authorized to discount negotiable paper; it is authorized to make loans to counties, cities, or political subdivisions of the state, or to state or national banks. It may not make loans or give its credit to any individual, association, or private corporation, except that it may make loans to any individual, association, or private corporation, secured by the duly recorded first mortgage on real estate, in the state of North Dakota, in amounts not to exceed one half of the value of the security, or secured by warehouse receipts issued by the industrial commission, or by any licensed warehouse within the state, in amounts not to exceed 90 per cent of the value of the commodities evidenced thereby. It may not loan on real estate security more than 30 per cent of its capital, nor, in addition thereto, more than 20 per cent of its deposits.

The act establishing the bank appropriated $100,000 to carry out the provisions of the act, which appropriation will not be used, and is in process of being repaid into the state treasury, by the industrial commission; this, for the reason that, though the "Bank of North Dakota" has been in operation less than a period of six months, it has, in that short period of time, so firmly established itself, and so rapidly did its business materialize, that it has been enabled to earn net, approximately, $67,000; it has made or has in course of completion over one and one-half million dollars in real estate loans, and has received other applications for more than six million dollars of such loans from the farmers of this state.

It is apparent that, as it is longer established, and continues to exercise the powers conferred upon it by law, and multiplies its business relations, its earning power will be very large, and this, on account of its large capital and deposits, which will all become active in carrying on such business transactions as are contemplated by the act creating it. That the bonds issued by the state for the purpose of furnishing capital to the bank, and the interest thereon, will be repaid out of the earnings, without the necessity of exercising the power of taxation provided for, would seem certain.

Section 5 of chapter 148, being the act providing for the issuing of

the bonds for the capital of the bank, provides that "from time to time the industrial commission shall, out of the earnings derived from the operation of the 'Bank of North Dakota,' pay to the state treasurer such moneys as the Commission shall deem available, to devote to the purpose of paying said bonds and interest. In making such payment the commission shall file a statement with the State Treasurer specifying the purpose of such payment. When moneys shall have been so paid to the state treasurer, he shall apply the same to their specified purpose as hereinafter directed."

Thus, it is seen that the payment of the bonds and interest out of the earnings is what is meant in § 182 of the Constitution as amended, by the use of the words "or such other provisions," where the constitutional provision uses the language: "Every law authorizing a bond issue shall provide for levying an annual tax or make other provisions, sufficient to pay the interest semiannually, and the principal within thirty years from the passage of such law."

There is a third method, also, provided for in chapter 148 of Session Laws of 1919, which may be resorted to, to pay both principal and interest of the bonds, should there be a deficit from either of the other sources of revenue to which we have referred. It is found in § 9 of the chapter just referred to. Keeping in mind that the principal and interest of the bonds, for the "Bank of North Dakota," are to be duly paid by taxes and the earnings of the bank, and that those are required to be placed in a special fund for that purpose, it is further provided, "If for any reason the said fund shall for the time being, be insufficient, the treasurer shall apply the deficiency out of any other available moneys of the state in his custody; but in that case he shall as soon as possible, out of the bank bond payment fund, return the amount of such deficiency to the source whence taken."

That ample provision has, by law, been made to pay the principal and interest of the "Bank of North Dakota Bonds," within the time specified by law, in accordance with the provisions of § 182 of the state Constitution as amended, there is not the least doubt; indeed, there could scarcely be a more perfect and thorough method of compliance than that provided.

"The bonds of the state of North Dakota, Mill and Elevator Series,"

in the sum of $5,000,000, are not secured exclusively by the faith and credit of the state of North Dakota, but, when issued, the payment thereof may be guaranteed as provided in § 182 as amended; and, when issued, delivered, and paid for, their payment is secured by the faith and credit of this state, as provided in chap. 153 of the Session Laws of the Regular Session of 1919. In addition thereto, they are secured by first mortgage on the state-owned utilities, enterprises, or industries, which such bonds are issued to construct and operate, in an amount not exceeding the value of them. They are made payable to the state treasurer.

The earnings of the elevators, mills, etc., are accumulated into a special fund, under the direction of an industrial commission, for the purposes of paying the principal and interest of the bonds. In fact, the same method is provided by chap. 153 of the Session Laws of 1919, for paying the principal and interest of such bonds, as the bonds issued for the purpose of establishing the "Bank of North Dakota;" that is, such bonds and interest shall be paid by a special fund accumulated from the earnings, and by taxation in the manner prescribed in the act, and if for any reason a deficiency arises from either of these sources, then the bonds or interest may be paid by the state treasurer, out of any available money in his custody. What is true of the mill and elevator bonds, as to the method of paying the principal and interest thereof, is likewise true of the $10,000,000 of bonds to be issued by the state of North Dakota, for the purpose of loaning upon real estate in the state of North Dakota, and of all other bonds under consideration in this case.

There is not the least doubt that the laws in question provide an ample and complete method for the payment of both principal and interest of the bonds in question, and one in entire harmony with the provision of § 182 of the Constitution as amended.

As to the second objection, we are clear that it contains no merit. The provision of the law in question, which confers upon the governor and the industrial commission the power and duty of fixing the denomination, date of maturity, and rate of interest of the bonds, is not the delegation of a legislative function, but it merely authorizes them to perform certain administrative duties, in accordance with the provi-

sions of the law authorizing and determining their administrative duties.

We come now to consider the third objection, wherein it is claimed that the bonds are issued, or are to be issued, in furtherance of private business, and not for a public purpose. With this objection may be examined the fourth, which claims that the plaintiffs, being required to pay taxes to pay the principal and interest of such bonds, are being deprived of their property without due process of law.

It is necessary in determining these objections, and before we enter far upon the discussion of them, to define, and have a clear conception of, the nature and meaning of private business.

We have been unable, in the search of the authorities, to find any complete definition of the term "private business." Perhaps there is none. It is one, however, which is readily defined. It may be defined as a business or enterprise in which an individual or individuals, an association, copartnership, or private corporation, have invested capital, time, attention, labor, and intelligence for the purpose of creating and conducting such business, for the sole purpose that those who make such contributions may, from the conducting of such business, make, gain, and acquire a financial profit, for their exclusive benefit, improvement, and enjoyment, and, exclusively, for their own private purposes.

They are not concerned with the public health, safety, morals, or welfare, but are concerned wholly with making a financial profit from the operation of such business, for, exclusively, their own private use and benefit.

As contradistinguished from a private business, a public purpose or public business has for its objective the promotion of the general welfare of all the inhabitants or residents, within a given political division, as, for example, a state, the sovereignty and sovereign powers of which are exercised to promote the public health, safety, morals, general welfare, security, prosperity, contentment, and equality before the law, of all the citizens of the state.

Having thus drawn the distinction between what constitutes private business, and what a public purpose, it is next in order to determine whether the proceeds of the bonds issued, or proposed to be issued, are to be used for promoting and conducting a private business, for the

benefit of certain individuals, associations, or private corporations, or are the proceeds to be used for a public purpose by the sovereign power, the state, for the promotion of the general welfare of all the people of the state.

If the industries to be established, and which are established, are are owned and operated by the state, in order to promote the general welfare of all the people, and the net profits derived from the operation of such industries become public funds of the state of North Dakota, and payable as such into its treasury, for the use and benefit of the state and inhabitants and residents thereof, in like manner as other public funds, then it must follow that the purpose, business, and industries are public.

It must be kept in mind, also, that the "Bank of North Dakota," "the Mill and Elevator Association," and all other agencies established by the state for the purpose of operating the state industries in question, are not private corporations or private agencies, but are, so to speak, arms of the sovereign power, the state, reaching out to execute its mandates.

When the "Bank of North Dakota" functions, it does so as an agency of the sovereign power of the state, in like manner as the treasurer of the state of North Dakota. The same is true of every other state industry which is the subject of this controversy.

We may now turn for an instant, and seek the reason of the state for entering into the conduct of the industries in controversy.

In the case of Scott v. Frazier, 258 Fed. 676, the Honorable Charles F. Amidon, District Judge, used the following most expressive language: "The people of North Dakota are farmers, many of them pioneers. Their life has been intensely individual. They have never been combined in incorporated or other business organizations, to train them in their common interest, or promote their general welfare. In the main, they have made their purchases, and sold their products, as individuals. Nearly all their live stock and grain are shipped to terminal markets at St. Paul, Minneapolis, and Duluth. There, these products pass into hands of large commission houses, elevators, and milling companies and live stock concerns.

"These interests are combined not only in corporations, chambers

of commerce, boards of trade, and interlocking directorates, but in the millions of understandings which arise among men having common interests, and living through long terms of years in the daily intercourse of great cities. These common understandings need not be embodied in articles of incorporation or trust agreements. They may be as intangible as the ancient 'powers of the air,' but they are as potent in the economic world as those ancient powers were thought to be in the affairs of men. It is the potency of this unity of life of men, dwelling together in daily intercourse, that has caused all nations, thus far, to be governed by cities.

"As North Dakota has become more thickly settled, and the means of intercourse have increased, and the evils of the existing marketing system have been better understood, no single factor has contributed as much to that result as the scientific investigation of the state's Agricultural College, and the Federal experts connected with the institution. That work has been going on for a generation, and has been carried to the homes of the state by extension workers, the press, and the political discussion of repeated political campaigns.

"The people have thus come to believe that the evils of the existing system consists not merely in the grading of grain, its weighing, its dockage, the price paid, and the disparity between the price of different grades, and the flour-producing capacity of the grain. They believe that the evil goes deeper; that the whole system of shipping the raw materials of North Dakota to these foreign terminals is wasteful and hostile to the best interests of the state. They say in substance:

"(1)  The raw materials of the state ought to be manufactured into commercial products within the state. In no other way can its industrial life be sufficently diversified to attain a healthy, economic development.

"(2)  The present system prevents diversified farming. The only way that it can be built up is to grind the grain in the state, which the state produces,—keep the by-products of bran and shorts here, and feed them to live stock upon the farms of the state. In no other way can a prosperous live-stock, dairy, and poultry industry be built up.

"(3)  The existing marketing system tends directly to the exhaustion of soil fertility. In no way can soil depletion be prevented, except

to feed out to live stock, at least as much of the by-product of grain raised upon the state's farms as that grain produces when ground, and thus put back into the soil, in the form of enriched manures, the elements which the raising of small grains takes from it."

In addition to the clear and concise reasons given by Judge Amidon, there are many others why the state should engage in the conduct of these industries.

The principal source of the production of wealth of North Dakota is agriculture; it is a conservative estimate that 90 per cent of the wealth produced by the state is from agriculture. It is the foundation of the state's prosperity and welfare, and upon it, as such, rests all other business of the state.

The mercantile pursuits, the banking interests, and every business pursuit, within the state, depends directly for its success upon the wealth produced by the farmers of this state.

The wealth produced by the farmers of this state is the life blood of the business interest of the state; hence, the conservation and securing of the wealth produced by the farmers, to them, is of vital interest, not only to the farmers, but to everyone who is engaged in the carrying on of business within the state.

The word "wealth," however, is a relative term as applied to the farmers of this state. It means only the excess which remains after deducting from the selling price of the products of the farmers' toil, the cost of production; that the farmer receive the full value of the product, which he produces, minus the cost of production, is a question which is of vital interest not only to him but to every business interest in the state. For business must be done on whatever profit there is, over and above the cost of production. Likewise, the wages of labor in this state, to some degree, depends upon the same conditions.

The farmer cannot pay a laborer high wages, if the cost of production is but little less than the selling price of the products he produces. If the farmer makes a small profit, business interest must languish, and labor, which the business interests employ, will, no doubt, more or less suffer by this condition, so that it may be concluded that the interest of everyone in the state is so vitally affected by the profits derived from agriculture, that the matter may be said to be, and is, of public

interest, and vitally affects the public welfare of all. It is thus appar-
ent that any condition which militates against the profits of the agri-
culturists of this state is inimicable to the general and public welfare
of the inhabitants of this state. It may not be amiss to consider one of
the principal productions of this state, and the great loss entailed in
marketing it; namely, wheat. On the average this state produces
annually, approximately 125,000,000 bushels of wheat.

Under the conditions which have heretofore existed, for the purpose
of marketing, wheat has been graded. The grades are No. 1 hard, No.
1 northern, No. 2, 3, 4, and no grade. Under this system of wheat
grading, the agriculturists of this state state have, in the last quarter
of a century, unquestionably lost hundreds of millions of dollars.
There has been what may be termed a "spread" between the No. 1 hard
and lowest grade above named of perhaps 20 cents per bushel, and
sometimes much more. This difference is made to exist on many pre-
texts; for instance, though one grade of wheat, say, for instance, No.
3, may contain wheat of just as good milling quality, and when man-
ufactured into flour, that flour may be, and is usually, of just as high
quality as that made from No. 1 hard wheat, there is, nevertheless,
perhaps a "spread" of 10 cents per bushel between the two grades of
wheat, based perhaps upon the fact that the lower grade of wheat may
be somewhat bleached by having stood out in the weather, in the
shocks, and have been subjected to inclement weather, while wheat,
near the same field, may have been threshed and secured without hav-
ing been subject to adverse weather conditions.

The only difference between the two grades of wheat, in this in-
stance, is practically one of color. The wheat which has been subject
to more or less inclement weather, being what is termed bleached, of
course, readily affords an excuse for the difference in grade and price.
Again, one grade of wheat, for illustration take the same grades, the
lower grade may weigh 45 lbs. to the bushel, and the higher 60
lbs. to the bushel; while there may be a great difference in their
weights, according to eminent authority, there is not, as a general rule,
much difference in their milling qualities and values.

It must be remembered that wheat is not sold by the measured
bushel; while a bushel, struck measure, of light wheat might not

weigh over 45 lbs. It must be remembered that 45 lbs. do not make a bushel, and that 60 lbs. do. It takes 60 lbs. of wheat to make a bushel, whether the wheat is heavy or light.

The 60 lbs. of the light No. 3 wheat, being of just as good milling quality as the No. 1 hard wheat, will substantially make just as much flour, of just as good quality, but, under the system of grading, by reason of the lightness of the poorer grade, there is perhaps a "spread" of all the way from 10 to 20 cents per bushel of 60 lbs.

Professor Ladd, President of the North Dakota Agricultural College, and one of the most eminent chemists and scientists of the United States, and well known, and his ability recognized in foreign nations, has demonstrated, scientifically, that the poorer grades of wheat, such as above referred to, are substantially of just as good milling value and produce flour equally of as high a grade as that of the highest grade of wheat, he concludes, and we agree with this conclusion, that the fair and equitable method of marketing wheat is to base the price thereof on its milling value.

It has been estimated that the loss to the farmers of this state, by loss in grains and the values fixed thereby, instead of by the milling value, coupled with the loss by dockage, and the failure to pay for the dockage, together with many other elements of loss in the marketing of wheat, outside of the state, including the loss of the fertility to the soil, by the failure to feed any of the by-products thereof to stock within the state, thereby enriching and revitalizing it, represents an annual loss of perhaps $55,000,000 to the wheat raisers of this state.

There is also, indisputably, considerable loss in the marketing of other grains, all of which taken together aggregate a vast sum. This vast loss is not only a loss to the farmers of the state, but it is as well a loss to the business, for it must be done on the profits above production.

These vast losses sustained by the farmer are reaped as rewards by the great elevators and milling interests, commission firms, chambers of commerce, located in Minneapolis, St. Paul, and Duluth, or other cities outside the state. Into their hands they have passed, as profits, never to return to the farmers or business interests of the state of North Dakota. To prevent these losses, to retain in the state of North

44 N. D.—27

Dakota, in the future, these lost profits, to pay the farmer the full value of the product of the soil produced by him, and by thus so doing to secure the prosperity of every business and of every inhabitant of the state, and thus promote the general and common welfare of every inhabitant of the state, the Constitution has been amended, laws enacted, and bonds, by the legislature, authorized and issued, for the purpose of affording the producers of grain within this state a market where they will receive the full value of their products.

Under § 185 of the Constitution of the state of North Dakota as amended, which was submitted to the people at an election, and by the votes of a majority of the voters voting at such election duly adopted, and which constitutional amendment has legally become a part of the organic law of this state, and is now in full force and effect, the state is duly authorized and empowered to establish and operate state-owned elevators and mills.

The legislature has enacted into law, the laws in question, establishing these state-owned utilities, under and by virtue of such constitutional authority. Not only were such laws duly enacted by the legislature of this state, but, after being enacted, under the initiative and referendum provision of the Constitution, they were, each and all, referred to the people for their approval, and at a general election each of said laws was again approved by the majority of the electors voting thereon.

It is often said that bread is the staff of life; that it is one of the prime necessities, there is not the least doubt; that, out of each of the grains raised in this state, prime necessities are manufactured is quite clear. All the grain raised in this state must be, and is, considered a prime necessity. It is needed and must be had to sustain the very life of the people, and without it people would starve, as they would freeze if they had no fuel.

We are thoroughly convinced that the establishing and maintaining of state-owned elevators and state-owned mills, for the marketing and manufacturing of wheat and other small grains produced in the state of North Dakota, is a public purpose, for which taxes may be levied in the manner provided by § 182 of the Constitution as amended, and that such state-owned elevators and flour mills may be paid for by tax-

ation, or by the other provisions set forth in § 182 as amended, and that the levying and collecting of such taxes, in the manner provided for in such constitutional amendment, and the laws herein, in question, in no manner violates the 14th Amendment of the Federal Constitution, nor does it, in any manner, constitute the taking of private property without due process of law. See Jones v. Portland, 245 U. S. 217, 62 L. ed. 252, L.R.A.1918C, 765, 38 Sup. Ct. Rep. 112, Ann. Cas. 1918E, 660. The appellants have cited a long list of authority upon which they rely to prove the correctness of their contentions. It is apparent to us after examination of such authority that the same is not in point. It relates to conditions and laws of an entirely different nature than those presented in this case. We cannot take time nor space to analyze all the authorities cited by appellant. Its character and inapplicability as authority is well illustrated by the case, Citizens Sav. & L. Asso. v. Topeka, 20 Wallace 655, 22 L. ed. 455.

In that case the city of Topeka, under an act of the Kansas legislature, undertook to issue $100,000 of its bonds payable to the King Wrought Iron Bridge Manufacturing and Iron Works Company of Topeka, to aid and encourage that company in establishing and operating bridge shops in Topeka. Such bonds were, as we view the matter, donated to said Bridge Company.

The Bridge Company was a private corporation engaged in a private business, the profits of which inured wholly to it. The donation of the bonds by the city of Topeka to it was the loaning of that city's credit to establish or carry on a private business or enterprise. The bonds were to be paid by the levy of taxes.

The Supreme Court of the United States held such bonds invalid for the reason that the bonds were issued to assist a private business, and not for a public purpose. It held, the city of Topeka having no authority to make the contract, there was no power to levy a tax.

That decision, however, does not apply in the case at bar. The industries under consideration in the present case are all public industries belonging to the state of North Dakota. None of them are private industries or enterprises, but, on the contrary, are public enterprises and businesses exclusively owned and wholly operated by the state of North Dakota in its sovereign capacity, for the use and benefit

of all the people of the state, in other words, for a public purpose. Hence the decision in the Topeka case, and largely all other authority cited by appellants, has no application to this case.

The creating and constituting of the "Bank of North Dakota" in the manner above set forth, the authorizing the $5,000,000 "mill and elevator bonds," and the $10,000,000 "bonds of North Dakota, real estate series," are, each and all, acts intended to stimulate the production of, and the caring for the marketing of, wheat and other small grains in the state of North Dakota, and that is held to be a public use, to effectuate which a tax may be levied and collected, and we so determine and decide. Each and all of said bond issues are in accord with the provisions of the Constitution in question and laws of the state of North Dakota, and we so hold.

In deciding, as we have, supra, that the state ownership and construction of elevators and mills, the creating of the "Bank of North Dakota," and the authorizing and issuing of all bonds in question, are for a public use, for which the legislature may authorize the levying and collection of a tax on the property within this state, it is clear, by the highest authority, that the decision of this court will be accepted and accorded the highest respect, if properly based upon merits and the provisions of the state Constitution, under consideration, and the laws in question are not contrary to the provisions of the Federal Constitution, and we hold they are not, for this court is presumed to be in better position to know the conditions existing in the state, affecting the matters in controversy, and is more favorably situated to acquire information in that regard.

See Hairston v. Danville v. W. R. Co. 208 U. S. 598, 607, 52 L. ed. 637, 641, 28 Sup. Ct. Rep. 331, 13 Ann. Cas. 1008; Union Lime Co. v. Chicago & N. W. R. Co. 233 U. S. 211, 58 L. ed. 924, 34 Sup. Ct. Rep. 522; Fallbrook Irrig. Dist. v. Bradley, 164 U. S. 112, 160, 41 L. ed. 369, 371, 17 Sup. Ct. Rep. 56; Clark v. Nash, 198 U. S. 361, 369, 49 L. ed. 1085, 1088, 25 Sup. Ct. Rep. 676, 4 Ann. Cas. 1171; Strickley v. Highland Boy Gold Min. Co. 200 U. S. 527, 531, 50 L. ed. 581, 583, 26 Sup. Ct. Rep. 301, 4 Ann. Cas. 1174; Offield v. New York, N. H. & H. R. Co. 203 U. S. 372, 377, 51 L. ed. 231, 236, 27 Sup. Ct. Rep. 72; O'Neill v. Leamer, 239 U. S. 244, 253, 60 L. ed. 249, 265, 36 Sup. Ct. Rep. 54.

The two constitutional amendents under .consideration were duly adopted by the deliberate act of the voters of the state. and its legislature.

This state, through the Enabling Act of Congress, was authorized to organize an independent state, with the power of self-government, and this, with no limitations or restraints, save, and .except, those prescribed by the Federal Constitution and its amendments, which are largely contained in § 10, article 1 of the Federal Constitution.

The state Constitution, and the amendments thereto, is the fundamental law of this state, and, as such, may be construed and carried into effect by the courts of the state, without their determinations, in this regard, being subject to a review by the Supreme Court of the United States, except, and unless, in cases where what is accomplished, or sought to be accomplished, is or may be assumed to be in conflict with the Federal Constitution, or some of the provisions. thereof, or restraints therein imposed upon the state, prohibiting the. exercise of certain powers by it.

Hence, the legislature of this state, except for the limitations and restraints contained in the Constitution of the United States, and the amendments adopted thereto, is left free to act, under the Constitution of the state of North Dakota, and it may enact such laws, in the exercise of its constitutional powers, as its legislative wisdom may direct.

The laws under consideration violate no provision of the Constitution of United States, nor of its amendments; nor are they violative of any provision of the state Constitution, nor any amendment. thereto.

The direct benefits which the people of this state are to receive from the constitutional provisions and laws in question have been quite thoroughly discussed. We may be permitted to refer to some of the indirect benefits and beneficial consequences which reasonably may be expected to materialize as a result of the adoption of the constitutional amendments, and the enactment of such laws, after they have been given sufficient opportunity to function.

While all such laws will, in a greater or lesser degree, contribute to the beneficial results which may be reasonably expected to result therefrom, the Home Building Act, and the act providing for the loaning of the $10,000,000 upon the farms and real estate, within this

state for the purpose of securing and providing homes for the residents of this state, will serve best to illustrate the conclusions we wish to draw with regard to the anticipated beneficent effect of these laws. Each of the laws and constitutional amendments is based upon a broad public policy, intended to be beneficial to every citizen of this state, as well as the state as such.

The home is the unit of organized and civilized society. The state is composed, largely, of the aggregate of such units. The strength of the state is in proportion to the average strength of the units of which it is composed. Figuratively speaking, the morality, integrity, and every element of its character, is measured by the average of those virtues and qualities of character existing in the units composing it.

For the state to afford to the home the greatest opportunity for the development of all that ennobles that home is but to secure its own solidarity and permanence.

The home, in effect, is a miniature government, wherein legislative, executive, and judicial power is exercised. In order for that home, that miniature government, to function properly and in the highest degree, it is necessary that the abode denominated home should be a fixed one. That is, the members of or the family constituting such home should receive such encouragement, at the hands of the law, such assistance and opportunity as would enable those not otherwise in position to do so, or anyone a resident of this state who desires to benefit by such law, to acquire a permanent home.

With what fond recollection do many of us consider the home of our youth, however humble it may have been. There is indelibly stamped upon our mind, mental picture of all the things surrounding and connected with it. This, for the reason that perhaps fifteen, twenty, or more years of the most joyous period of life, that of youth, was enjoyed at, and within, such home. In other words, it is the very permanence of the home, and our long association with and attachment to it, that endears it to us, and thus we reach the philosophy which lies at the base of the Home Building Act and other acts under consideration of the same nature.

All the land in this state was, at one time, subject to homestead entry, under the laws of the United States, and this practically free

of charge. Nevertheless, and notwithstanding, this great gift of land to our people, many of them have been unable to prosper and maintain a home thereon, and this, notwithstanding the people of the state are as frugal and as of high character as any in the United States, or in the world.

There are 30 or perhaps 40 per cent of the people of this state, especially the farmers of the state, who are tenants. They have no fixed abode; they move from place to place, year by year, or at intervals. They have no permanent home, where they may stay, for fifteen or twenty years, or even a whole lifetime, and where their children may perhaps desire to remain after the parents have passed beyond. While, in some instances, some of the homeless and landless may be individually responsible for the financial condition in which they find themselves, nevertheless, as a whole, it is clear that their condition is brought about through circumstances and conditions, entirely beyond their control.

It may be, and perhaps it is, true that they have not received the full market value of the products which they have produced. It may be, and perhaps partly is, because they have been compelled to pay excessive rates of interest; it may be perhaps they have been compelled to pay excessive prices to procure the bare necessities of life; whatever the causes may be, it is sure that they exist.

To seek those causes, and to remove them, is a great task, to accomplish which the legislator must employ his greatest intelligence, guided by the dictates of his conscience. If he, however, does this, and does it well and wisely, by just and progressive laws, fairly and fearlessly enacted, his services to the state and the people thereof will be of immeasurable value. For, if opportunity is afforded those who desire it to obtain a home, and if beneficent laws are enacted which will enable the home owner, by the exercise of reasonable effort and the doing of a reasonable amount of labor, the value of which is secured to him by protective laws, to maintain and retain such home, he will become attached to it, and will be vitally interested in all that concerns it, and thus become more vitally interested in the welfare of his state and nation.

Such, we believe, was the spirit of the legislature, which duly

enacted the laws which are in question, and it was the same spirit that moved the people of this state to adopt the constitutional provisions in question.

We are fully convinced they had ample and full authority to do that which they have done, and that they have done it well and wisely, and their work should be, for no light or transient reason, undone.

The laws enacted are constitutional, and not contrary to any of the provisions of the Constitution of the United States, or the amendments thereto. The people of this state have the right, authority, and privileges to amend their Constitution, in the way it has been amended by the two provisions in question, neither of which are in conflict with the Federal Constitution or its amendments; and neither the laws nor the amendments to the state Constitution take from the plaintiffs any right guaranteed to them under the 14th Amendment to the Federal Constitution.

We are of the opinion that the order of the trial court sustaining the demurrer of the defendants to the complaint of the plaintiff was a proper one, and should be affirmed.

It is affirmed.

The case is forthwith remanded.

ROBINSON and BRONSON, JJ., concur.

BRONSON, J. I concur in the opinion of Justice Grace. Chief Justice Christianson, in an opinion which can be termed neither a dissent nor a concurrence, considered this case a friendly lawsuit, presenting no actual controversy, and in effect refusing to pass upon the issues submitted by reason of his dissenting opinion in a former case (State ex rel. Byerly v. State Canvassers, ante, 126, 172 N. W. 80) holding certain constitutional amendments to be not constitutionally adopted.

This case is here upon appeal from a demurrer to the complaint sustained in the trial court; there is no contention made by the parties that this is in any manner merely a friendly lawsuit. Real issues are presented. The fact that these issues, from a legal viewpoint upon the facts, are without merit, does not create thereby a case involving no actual controversy.

There is no contention by any of the parties that the constitutional amendments, now a part of the Constitution of this state, ratified by the people and the legislature, and approved by this court (ante, 126, 172 N. W. 80), upon which the particular acts now involved were enacted, are unconstitutional. Upon the issues presented before this court, three questions are presented, involving Federal and state constitutional provisions; (1st) That the acts involved are not for public purposes; (2d) that no proper constitutional provision has been made for sinking funds; (3d) that legislative powers have been improperly delegated; I desire to consider briefly one question. Do the acts involve public purposes? There can be no question that under the state Constitution the acts involved are all within the constitutional provisions, adopted both by the people and the legislature, for such purposes. From the viewpoint of the state constitutional authority, as ratified by the people and the legislature of this state, there can be no question that these acts involved cover a procedure which is deemed and declared by this state to be public in its nature. The only further question involved is whether this state in the proper exercise of its police power, pursuant to the will of the people, as declared in the Constitution and its laws, deprives or may deprive the relators, and those similarly situated, of the protection of the Federal Constitution in taking or attempting to take, by process of taxation, for such purposes, their property. If the acts involved, considered with reference to the Federal Constitution, and the Federal Judicial interpretation that may be placed thereupon, are for public purposes, they are valid, and not subject to Federal constitutional objections. Peculiarly in this state, for a great many years, the production, marketing, and sale of cereals has become a matter of public concern and public welfare. For many years, progressively statutory authority has been enacted covering state supervision, state aid and state regulation in the furnishing of seed, the quality of the seed, the raising or production of wheat, or other cereals, the grading of grain, the public storage of the same, covering dockage, regulation of elevators, state experimentation in cereals, and their manufactured products. Through a long-continued and persistent public demand, the people of this state, through constitutional amendment and legislative enactment, have stated that

it is essential for the public welfare of this state, dependent upon agriculture and its products, and for the well-being of the state and its citizens, to regulate, supervise, and, even own in a limited way, public elevators, warehouses, and mills engaged in handling or manufacturing these cereals.

In this connection and for these purposes, declared to be public by the people and the sovereign power of this state, the acts involved herein have been enacted. The State Terminal Elevator and Mill Act is the principal and fundamental act. It provides a means for all of the people of this state, both producers and consumers, to secure for its main and chief source of all of its wealth, a regulation, a supervision, and a demonstration of the real worth as a commodity of the cereals produced in this state, principally wheat, and the manufactured product, flour. It seeks to show, through state demonstration and experimentation in a limited way, to all of the people of this state, the enormous waste and loss that is suffered by the people of this state through improper marketing conditions, through unscientific grading of grain, through unnecessary loss by extensive railway hauls, and through excessive loss sustained at seasons of the year when grain so produced in this state must either lie in the field, or be taken in railroad transportation to terminals without the state. The other acts are all corollary to this main act. They aid and assist in carrying out this function of the state in behalf of its citizens, for public purposes, and for their public welfare. The Home Building Act is also corollary, evidencing in a manner governmental aid in upbuilding the homes for any or all of the citizens in this state, analogous somewhat to rural-credit systems. There ought to be no question that these acts present a public purpose upon a much higher plane, and much more for the general common good than that evidenced and upheld by the Supreme Court of our United States, concerning a municipal fuel yard, in Jones v. Portland, 245 U. S. 217, 62 L. ed. 252, L.R.A.1918C, 765, 38 Sup. Ct. Rep. 112, Ann. Cas. 1918E, 660.

BIRDZELL, J. I concur in the affirmance of the order appealed from on the ground that the respondents, who were plaintiffs below, have not demonstrated the unconstitutionality of the acts of the legislature upon

which the defendants and appellants rely for justification of the acts complained of in the complaint filed. Neither upon oral argument nor in the briefs have the respondents pointed out wherein the provisions of the state Constitution are violated by the failure of the acts to provide for a sufficient sinking fund to pay the principal of the bonds to be issued, nor wherein legislative functions have been delegated in the matter of fixing amounts, denominations, maturities, and rates of interest. In fact, the appellants in their brief have contented themselves with a mere statement of the foregoing constitutional objections, without attempting to specify or point out wherein the Constitution has been violated in those connections. Obviously the ordinary presumption of the constitutionality of acts of the legislature obtains, and it is not overcome by a mere statement of a constitutional objection to legislation which does not purport to show wherein the Constitution has been violated in the manner stated. There is no argument in the brief in support of the foregoing objections. It is not contended that, in connection with the authority to issue bonds, provision is not made sufficient to pay the interest semiannually and the principal within thirty years from the passage of the law, within the requirements of § 182 of the Constitution as amended. So this objection might properly be considered as abandoned.

As to the objection that the provisions in the various laws authorizing the governor and the industrial commission to fix amounts, denominations, maturities, and rates of interest, involve delegation of legislative power, it is not apparent wherein the indebtedness for the specific purposes has not been adequately authorized by the legislature, nor wherein the provisions relating to denominations, rates of interest, etc., amount to anything more or less than regulations of detail in carrying out the authorized purposes. On its merits, therefore, this objection should be regarded as being without foundation.

With the exception noted above, the brief of the appellants concerns itself wholly with the argument that the purposes for which the bonds are authorized to be issued are not public purposes, and are therefore purposes for which taxes cannot be levied without depriving the appellants of property without due process of law, in violation of article 14 of the Amendments of the Constitution of the United States.

This question is one for the ultimate determination of the judicial authority of the Federal government. This court knows from facts stated upon the oral argument, as well as from facts which are a matter of general information in the state, that a similar suit is now pending for decision in the Supreme Court of the United States, the decision rendered by the Federal district judge being cited and relied upon in the principal opinion herein. It is also a matter of general information that at the special session of the legislature, just recently closed, a joint resolution was passed asking for the advancement of the hearing of that cause in the Federal Supreme Court. From these facts it might at first blush seem that the decision of this question now by this court would be a work or supererogation. But the Supreme Court of the United States has said that the decision of the highest court of a state, as to what should be deemed a public purpose in a particular state, is entitled to the highest respect, and therefore it may not be out of place for this court to concern itself with the Federal question, to the extent at least of expressing its opinion upon whether or not the purposes for which the indebtedness is authorized to be created are public. See Jones v. Portland, 245 U. S. 217, 62 L. ed. 252, L.R.A.1918C, 765, 38 Sup. Ct. Rep. 112, Ann. Cas. 1918E, 660.

What is or what is not a public purpose must necessarily depend upon the condition which calls forth the particular activity on the part of the state. The economic and legislative history of the state affords the chief repository of information to be drawn upon in the decision of the question. This matter has been so clearly stated in the decision of the Federal district judge that it seems superflous to do more than adopt that opinion.

It is of course the prime function of government to secure and preserve equality of economic opportunity, and in order to do so the state must concern itself with the facts. It is confronted by a condition. If the people of the state, through the adoption of constitutional amendments (going back a number of years, for instance, to the adoption of amendments authorizing public ownership of terminal elevators), and by the adoption at referendum election of acts of the legislature submitted for their approval, conceive that the conditions to be dealt with require a limited public ownership of businesses or utilities as in-

strumentalities to be employed in securing a greater degree of equality of economic opportunity, their judgment upon such question is entitled to the greatest weight. I say "limited public ownership," for the reason that, after all, that is all that is attempted, for the government of the state of North Dakota cannot take a long stride in the direction of public ownership of businesses, heretofore considered exclusively private, with the means at its disposal, and manifestly all steps taken must be justified upon the basis either of experience or experiment. A court is not so gifted with assured wisdom or prophetic vision that it can say in advance of actual trial when the limit will be reached. Suffice it to say that the question as now presented is one partaking so strongly of a political character that the people can neither avoid the responsibility for, nor escape the consequences of, its decision either way. The Constitution, as I view it, is not a legal straight-jacket, restraining the movement of the governments of sovereign states at every turn in their attempts to grapple with their peculiar economic and governmental problems. Neither does it acts as a perpetual check upon the application of remedies which the people of a state might deem it expedient to employ in solving their own problems. Whatever damages the plaintiffs in this case may suffer, they will suffer as members of the democratic family associated as the government of the state. I know of no way a citizen in a democracy can be relieved of his share of the burden incident to the character of the government, and, as a matter of reciprocity, it may be noted that all the blessings of a democratic government are thrust upon an unassenting minority. Concededly the experiment attacked is a public one, and in this respect it differs from all attempts that have been heretofore made to accomplish governmental aims through aid to private individuals and corporations. The control here is also public.

From the standpoint of constitutional law the essence of the whole matter is that the validity of the laws assailed cannot be decided out of hand on the basis of what might or might not have been considered a public use under some anterior condition of society.

While the legislative declaration of the public purpose is not conclusive, it cannot be judicially declared erroneous or unfounded in this state, in view of the previous industrial and economic experiences of our population.

CHRISTIANSON, Ch. J.   In my opinion this is a so-called friendly or "fictitious" lawsuit, and does not in fact present an actual controversy.   Hence, I am agreed that the action should be dismissed. See Chicago & G. T. R. Co. v. Wellman, 143 U. S. 339, 36 L. ed. 176, 12 Sup. Ct. Rep. 400.

The majority members, however, treat the case as a real one, and pass upon the merits of the constitutional questions.   In so doing they hold (as announced in paragraph 2 of the syllabus),—and their conclusions upon all questions discussed in the majority opinion are predicated upon the proposition,—that certain amendments proposed by initiative petition and submitted to the electors at the general election in 1918 were duly adopted and became a part of the state Constitution.   For the reasons stated by me in my concurring opinion in State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281, and in my dissenting opinions in State ex rel. Twichell v. Hall, post, 459, 171 N. W. 213, and State ex rel. Byerly v. State Canvassers, ante, 126, 172 N. W. 80, I am of the opinion that such alleged constitutional amendments were never constitutionally adopted, and in fact never became a part of the Constitution of this state.

Affirmed in 253 U. S. 233, 64 L. ed. 878, 40 Sup. Ct. Rep. 499.