## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT

### OF

# NORTH DAKOTA

STATE OF NORTH DAKOTA, Doing Business as the Bank of North Dakota, as Agent for the State Treasurer of the State of North Dakota, as Trustee of the State of North Dakota, and C. A. Fisher, as State Treasurer of the State of North Dakota, as Trustee of the State of North Dakota, Respondents and Appellants, v. BURLEIGH COUNTY, NORTH DAKOTA, a Municipal Corporation, Frank J. Johnson, as County Auditor of Said Burleigh County, and G. L. Spear, as County Treasurer of Said Burleigh County, Appellants and Respondents.

(212 N. W. 217.)

**Constitutional law — courts should adopt construction of statute avoiding grave and doubtful constitutional questions.**

1. Where a statute is susceptible of two constructions by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, it is the duty of courts to adopt the latter construction.

Annotation.—As to adoption of construction of statute avoiding doubtful questions, see 25 R. C. L. 1002; 3 R. C. L. Supp. 1437; 4 R. C. L. Supp. 1615; 5 R. C. L. Supp. 1358; 6 R. C. L. Supp. 1498.

On taxation of lands bought by state at sale for nonpayment of taxes, see 26 R. C. L. 332; 5 R. C. L. Supp. 1042.

55 N. Dak.—1.

**Taxation** — statute, canceling unpaid taxes on lands of state acquired by mortgage foreclosure, does not embrace rights of county under certificates of tax sale.

2. Construing § 9, chapter 292, Laws of 1923, which directs the cancellation of unpaid taxes upon lands acquired by the state through foreclosure of certain mortgages, the operation of the act, when construed to embrace rights acquired by the county under certificates of tax sale, is considered in the light of § 176 of the state Constitution, which provides that taxes shall be uniform upon the same class of property including franchises within the territorial limits of the authority levying the tax, and of § 175 of the Constitution, which provides that every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied, and it is held that the construction contended for raises doubtful, constitutional questions going to the validity of the enactment.

**Taxation** — county not accountable to taxing district until redemption or assignment of tax certificate, but to tax debtor — tax paid by operation of law.

3. Where property is sold to satisfy delinquent taxes and in the absence of bidders is struck off to the county, the county is not, under §§ 2202, 2203 and 2204 of the Compiled Laws of 1913, accountable to the taxing districts for the amount of the taxes until there is a redemption or the tax certificate is assigned, but, as to the tax debtor and the property liable, by operation of law the tax is paid.

**Taxation** — statute canceling taxes held not to extinguish rights of county as holder of tax title.

4. Section 9 of chapter 292, Laws of 1923, which directs that upon the issuance of a sheriff's deed in foreclosure proceedings brought to realize upon a farm loan mortgage taken by the state under the provisions of the act or of chapter 147, Laws of 1919, any taxes then remaining unpaid shall be canceled and abated by the board of county commissioners is construed and held not to extinguish the rights of the county as the holder of a tax certificate.

**Taxation** — acquisition of property by state by foreclosure does not cancel outstanding liens of county based on tax sales, regardless of statute.

5. Section 176 of the state Constitution, which provides that the property of the state shall be exempt from taxation, is construed in relation to tax liens held by a county at the time of the acquisition of property for other than a public governmental purpose, and it is held that the acquisition of property by the state or its departments, through the foreclosure of a mortgage taken as security for a loan, does not operate to cancel outstanding liens based upon tax sales.

**Taxation** — ownership and not use of property, is test of immunity from taxation.

6. Under § 176 of the state Constitution, the ownership and not the use to

which property is put, nor the purpose for which it is acquired, affords the test of its immunity from taxation, and property acquired through foreclosure of a mortgage taken as security for a loan is, while held by the state, exempt from taxation.

**Taxation — where county holds tax certificate after purchase, property may not again be sold for delinquent taxes — lien of county augmented by operation of law.**

7. Where a county holds a tax certificate issued to it after purchase, under § 2191, Compiled Laws of 1913, the property may not be again sold for delinquent taxes, but as taxes become delinquent the lien of the county, evidenced by the certificate, is augmented by operation of law.

**Taxation — lien of county : sed on tax certificate draws interest — land held by state on foreclosure — unenforceable — remedy suspended.**

8. Where the county holds a tax certificate representing the lien of taxes for which the property had been sold or which had become delinquent prior to the time when the state acquired title to the property through mortgage foreclosure, the tax certificate continues to draw the rates of interest prescribed by statute, but the lien of the county is unenforcible and all remedy upon the tax certificate, including the acquisition of title by tax deed, is suspended during the time the property is owned by the state, but such lien may be asserted and enforced against a subsequent purchaser from the state.

Opinion filed January 17, 1927. Rehearing denied February 2, 1927.

Constitutional Law, 12 C. J. § 220 p. 788 n. 97. Taxation, 37 Cyc. p. 872 n. 95; p. 1359 n. 6 New; p. 1477 n. 74; p. 1536 n. 97 New; p. 1592 n. 62 New.

Appeal from the District Court of Burleigh County, *Jansonius,* J. Affirmed.

*O'Hare & Cox* and *P. H. Butler,* for appellants.

"The state does not tax the property of a municipality for state and county purposes, because this would be a taxation of its own property. For the same reason, when the property has come into the ownership of a municipal corporation, it will not attempt to enforce the tax by the sale of the property. The absurdity of its doing so would be apparent in the case where a county had acquired such property under the circumstances here present, and the state should sell it." Smith v. Santa Monica, 162 Cal. 221, 121 Pac. 920.

"If such property is expressly exempted by the Constitution or statute, and there are no qualifying words used, the property is exempt regardless of its use." Cooley, Taxn. 4th ed. 638.

"No person or municipality can acquire as against the state a vested right to taxes or the right to insist upon the collection of taxes when levied." Gassaway v. Seattle (Wash.) 100 Pac. 991.

*F. E. McCurdy,* for respondents.

It is well settled that the state as a governmental agency is vested with certain constitutional privileges and powers which it does not enjoy as a business agent and has been so settled ever since the early days of the Constitution. United States v. First Planters Bank, 9 Wheat. 904, 6 L. ed. 244. Also see Hughes County v. Henry (S. D.) 202 N. W. 286.

"The power to tax involves the power to destroy. The superiority of the lien for general taxes must be asserted even to the point of destroying the lien of the local assessment." McCulloch v. Maryland, 4 Wheat. 431, 4 L. ed. 579.

BIRDZELL, Ch. J. In December, 1919, Nestor Rutanen borrowed from the Bank of North Dakota $2,500, securing the loan by a mortgage given on a quarter section of land owned by him in Burleigh county. In regular course the mortgage was assigned to the treasurer of the state of North Dakota as security for bonds of the real estate series issued by the State. Rutanen did not pay the taxes on the land for the years 1920, 1921, 1922, and 1923, and at the tax sale, there being no bidders, the land was struck off to the county and a tax certificate issued. In 1923, Rutanen being in default, the mortgage was foreclosed and the property was bid in by the state treasurer, as trustee. No redemption was made and in October, 1924, a sheriff's deed was issued to the plaintiff, state treasurer, as trustee for the state of North Dakota. Upon obtaining the deed, the plaintiff demanded that the board of county commissioners cancel and abate the taxes for the years 1920 to 1923, both inclusive, for which the land had been sold to the county. In April, 1925, plaintiff repeated this demand and also requested the cancellation of the taxes for the year 1924. Upon the refusal of the commissioners to comply, this action was brought to quiet title. The district court held that the taxes for which the property had been sold at the date of the issuance of the sheriff's deed should not be canceled of record and that the plaintiff was not entitled to the relief demanded; but that the 1924 taxes which were not due at the time of

acquisition of title by the plaintiff should be canceled and discharged. Both parties appeal and each assigns error upon that portion of the judgment which is adverse to its contention.

We shall consider first the contention of the plaintiff to the effect that, under § 9 of chapter 292, Session Laws of 1923, it is the mandatory duty of the board of county commissioners to cancel and abate the taxes which had become delinquent and for which the land had been sold prior to the date of the sheriff's deed. The provision of the statute upon which this contention is based is contained in a comprehensive act governing the loaning of money upon farm mortgage security by the Bank of North Dakota and the issuance of bonds to procure funds to replace those employed by the bank in the enterprise. The statute provides for the assignment of the mortgages by the bank to the State Treasurer in trust as security for the bonds to be issued. It further provides that in case default shall occur in the payments or in the conditions of any mortgage and continue for a period of a year, the mortgage shall be foreclosed or collected; and, in case of foreclosure sale, if no bid is made equal to the amount due at the date of the sale, including costs, disbursements and statutory attorneys' fees, the property shall be bid in in the name of the state treasurer, as trustee for the State. The net proceeds of the sale or of the redemption are required to be turned over to the treasurer to be invested in the bonds issued under the act or in new mortgages substituted for the mortgage foreclosed. In case no redemption is made, the sheriff's deed issues to the state treasurer, as trustee for the state. After outlining this procedure, the statute provides (§ 9) ". . . Any taxes then remaining unpaid thereon shall be cancelled and abated by the board of county commissioners of the county wherein such land is situated. Any land, title to which is acquired through foreclosure, may be sold by the state treasurer, as such trustee, through the Bank of North Dakota acting as his agent, for the best price and terms obtainable, all proceeds of such sales shall accrue to the real estate bond payment fund. Any such sale must be approved in writing by the industrial commission, . . ."

The specific question presented is whether or not the statutory direction to cancel and abate the unpaid taxes applies as to taxes which accrued after the mortgage was given and for which the land had been sold to the county before the sheriff's deed in foreclosure was issued.

It is argued that whatever rule might obtain where there is an outstanding tax sale certificate in the hands of an individual (the certificate in such case being a contract. Fisher v. Betts, 12 N. D. 197, 96 N. W. 132; Beggs v. Paine, 15 N. D. 436, 109 N. W. 322), the taxes have not been *paid* through a sale of the property to the county and that the statutory direction to cancel applies. The argument, in substance, is that the statutory direction to cancel and abate unpaid taxes amounts to a direction to cancel tax certificates, though the latter are not referred to in the act.

The statutes governing tax sales do make a distinction between a tax sale resulting in the issuance of a certificate to a private bidder and one resulting in the issuance of a certificate to the county in the matter of the county's liability to the taxing districts. But does this distinction support the contention of the plaintiff that in the latter case the taxes are "unpaid" within the language of § 9, supra? That is the vital query in this case.

Under the statutes the county may retain the certificate, it may assign it to one who pays the amount of its bid, or, if title is later completed, it may sell the property, and upon the assignment of the certificate or upon resale it must credit the proportionate shares of the proceeds, to the extent of the taxes, to the respective taxing districts. Comp. Laws 1913, §§ 2202–2204. But where the property upon tax sale is bid in by another, the amount of the tax, being immediately paid for the property, is at once credited; and the tax sale certificate which is issued is a contract the obligation of which can not be impaired. Fisher v. Betts, supra. A result which could only be obviated by regarding the mortgage as superior to the tax lien from the beginning, and it is not contended that it has been made so. In view of the disastrous effect upon tax sales, there should be a clear legislative expression to warrant such a holding. See Hughes County v. Henry, 48 S. D. 98, 202 N. W. 286. But this distinction is one which exhausts itself in determining when the respective taxing districts are entitled to credit and what further steps may be necessary to realize the funds for which the property is held by the county. Certainly, so far as the tax debtor is concerned, the tax is paid by the sale, whether there be a private bidder or whether the property be struck off to the county for the amount of the tax, interest, penalty and costs. 26 R. C.

L. 417; United States v. Lawton, 110 U. S. 146, 28 L. ed. 100, 3 Sup. Ct. Rep. 545. To illustrate: If personal taxes of a particular tax debtor, for which he is liable to a personal judgment, had been entered as a lien against his land and the land sold, under §§ 2174 and 2191, Compiled Laws of 1913, and such taxes had been included in the sale and in the certificate issued to the county in the absence of private bidders, the county could not thereafter maintain an action to obtain a personal judgment for such taxes. The personal tax would be paid by this proceeding just as effectually as a mortgage debt is paid by being included in the amount of the bid of the mortgagee at a mortgage foreclosure sale. The tax sale has the effect of foreclosing the lien for the taxes and paying them to the extent that the taxes are included in the bidding, as under the statute they are required to be; but the taxing districts are not, at this stage, entitled to be credited by the county while it holds the tax certificate. After the sale there is no longer a tax which is subject to abatement. But there is a certificate evidencing the foreclosure and the right of the holder to obtain title, unless there be a redemption within the prescribed time. Ordinarily, we do not speak of cancelling or abating a tax after it has become merged in a tax sale certificate. But where abatement after sale *is* spoken of or permitted, the legislature has not left its meaning in doubt. See § 2165, Compiled Laws of 1913 and Supplement. It has authorized it only when the real estate has not been sold to "any purchaser other than the county." It may be noted in passing that abatements here referred to are apparently in the interest of just and equal taxation as they are predicated upon unjust, illegal or other action going to the merits of the tax. In the instant case, had the legislature intended to deprive the county, and through the county the local subdivisions of the ownership of property which had been acquired at tax sale, in favor of the real estate bond payment fund, it would seem that it would have expressly directed that the certificate be canceled instead of directing that the tax which no longer exists in law or in fact be canceled or abated without regard to questions of justice or legality.

When the legislature upon another occasion desired to qualify the rights of the county under tax certificates, it used terminology entirely appropriate to that end, as appears in chapter 210, Session Laws of

1925.   There it was desired to give to redemptioners the benefit of a lower rate of interest in case they should exercise the right of redemption within a given time.   The legislators did not speak of abating the taxes or the penalty and interest, but they provided that the real estate which had been sold to the county for the taxes for a given year or any prior year, which was still held by the county, might be redeemed from the sale upon the payment of the amount for which it had been sold, together with interest at 6 per cent, plus the subsequent taxes with interest at 6 per cent.   They further extended the right by authorizing the redemption of property which was held by the county at the time the act took effect but which might have been sold or assigned subsequently.   If the contention of the plaintiff be correct in the instant case, the county could assign its tax certificates under the statute the day before the sheriff's deed would issue in the foreclosure proceedings and the land would remain subject to the right of the assignee under the certificate, and the various taxing districts would reap the benefit of the assignment.   For it must be conceded that the taxes would be "paid" within the statute by such an assignment and, consequently, the direction to cancel would not be applicable.   Furthermore, there is no attempt to distinguish between a tax certificate evidencing the holder's original purchase and one evidencing his right as an assignee. The test for cancellation under the statute is whether the tax is paid or unpaid.   It could not be successfully contended that the right of a private holder of a tax sale certificate evidencing his original purchase would be in the least affected by subsequent abatement or cancellation of the tax for which the property had been sold.   This would impair the obligation of his contract and a law that would purport to authorize it would be void.   Yet the tax is no more paid through the original private purchase at the tax sale than it is through a subsequent assignment by the county to a private individual who pays the amount of the county's bid.   If, perchance, on the other hand, the certificate were not assigned prior to the issuance of the sheriff's deed in foreclosure, the rights of the county and the various subdivisions are, according to the plaintiff's contentions, ipso facto wiped out and transferred automatically over to the bond payment fund in the hands of the state treasurer.   If, following the direction of the statute in question, the treasurer should immediately re-sell the land for an amount sufficient to redeem from the tax sale and to pay the principal, interest and costs in the foreclosure

proceeding, the plaintiff contends that the taxes for which the property was sold must be canceled and the money turned into the bond payment fund. And this, even though the land were resold to the original mortgagor who would have been compelled to pay the taxes had he redeemed. It is indeed singular that a statute designed to have such a peculiar effect would not contain stronger evidence of a legislative intention than a mere direction to cancel unpaid taxes. Ordinarily, unpaid taxes would include only those of the current year, or those which had accrued during the period of redemption from the mortgage foreclosure sale and which, consequently, had been assessed and levied during a time when the State held a defeasible title. It is one thing to direct that such a tax be canceled and quite a different matter to direct the cancellation of tax certificates substantially representing the ownership of the property.

There is so little difference between a diversion of local revenues to a purpose other than that for which they were originally levied and a taking of the property, which is the sole security for those revenues, or which stands in lieu of them, for a different purpose that a construction of the act such as contended for by the plaintiff raises serious constitutional questions. It is contended that the incidental loss of local revenue in a locality where the patronage of the farm loan department has been liberal and the ability to pay taxes limited through a period of several years, is offset through the gain to the bond payment fund, without which it would sustain losses to be met by taxation. The obvious answer is that the direction to cancel applies even though there be no loss to the bond payment fund, in which event the tax moneys are indirectly used to the profit of those patronizing the department; for, theoretically, the loan service is to be supplied at cost. It is difficult to understand the persistency with which the discussion centers on the event of loss when it is so apparent that the statute applies without regard to loss in the particular transaction and even in the face of assured profit. The further answer is that if there be a loss it is a loss which must ultimately be borne by taxpayers generally and not by taxpayers in a locality where the experience has been especially unfortunate. The enterprise is general; not local. Under the Constitution taxation must be uniform within the territorial limits of the authority levying the tax. It can not be distributed over different areas

according to the varying degrees of success or failure within them of a general enterprise. The procedure contended for might visit extreme inequality of tax burden upon different properties or taxpayers in the same district by compelling those not patronizing the state farm loan department or those paying their obligations to make up the shortage in revenues incident to the cancellation of tax certificates which stand in lieu thereof. It would scarcely be contended that the State could originally favor the farm loan department or its patrons by exempting the land mortgaged to it from taxation while taxing the remainder, and it is difficult to see how a like result may be achieved after defaults have occurred, consistent with the constitutional requirements of uniformity. This requirement may be violated by cancellation or abatement as well as by assessment and levy. 26 R. C. L. 252; Wilson v. Sutter County, 47 Cal. 91; Gunnison County v. Owen, 7 Colo: 467, 4 Pac. 795; State ex rel. Richards v. Armstrong, 17 Utah, 166, 41 L.R.A. 407, 53 Pac. 981. While in the view we take of the case it is unnecessary to declare the extent to which the legislature may go in this matter under the Constitution, we nevertheless feel justified in pointing to the serious consequences and logical results of the contentions made as bearing upon the proper construction of the act in question. We would not lightly ascribe to the legislature an intention at variance with well defined constitutional principles.

It should also be observed that at the time of the mortgage foreclosure sale the property is offered to bidders subject to the rights of the county under the tax certificates. Bids are not solicited on the basis of the worth of the property free of the liens of the tax certificates. It should be assumed that the property which is offered at judicial sale is offered to bidders standing upon an equality (see Sletten v. First Nat. Bank, 37 N. D. 47, 163 N. W. 534; State ex rel. Atkins v. Lawler, 53 N. D. 278, 205 N. W. 880), and the state is a qualified bidder. Neither could the property have been redeemed within the period of redemption without the redemptioner taking it subject to the tax certificates.

From the beginning of the foreclosure proceeding to the end, no one is given an opportunity to purchase the land at a price which will pay the mortgage, interest and costs in full and a portion of the tax lien. Hence, the proceeding does not result in a determination that the land

is not worth more than enough to discharge the mortgage lien. The sale not having eliminated purchasers willing to pay the mortgage lien and a substantial portion of the tax lien, a legislative direction to cancel outstanding tax certificates could not be justified solely on the basis of necessity to protect the bond payment fund from loss. So, even conceding that it might be permissible for the state to protect the bond payment fund in preference to the revenue funds in which the subdivisions are interested, an attempt to do so through arbitrary cancellation of tax certificates, without regard to the value of the property chargeable with both liens, is open to the usual objections against arbitrary action. If the tax lien may be canceled without regard to the adequacy of the security for both the tax lien and the mortgage lien, or for the entire mortgage lien and a portion of the tax lien, it could as well be declared in advance that the lien for taxes should never attach to property mortgaged to the state as security for a loan, and the tax in this event would be noncollectible. Real estate taxes are obligations in rem and the constitution declares "Taxes"—not merely assessments—"shall be uniform upon the same class of property, including franchises, within the territorial limits of the authority levying the tax." Section 176. "Uniformity in taxing, implies equality in the burden of taxation." Exchange Bank v. Hines, 3 Ohio St. 1–15. Obviously, there could be no uniformity as between two tracts of equal value in private ownership if one only were subjected to an enforceable obligation for taxes. This constitutional requirement is just as sacred as the declaration that the property of the state shall be exempt. There is here no attempt to tax state property. Rather there is asserted in behalf of a state agency a claim to immunity covering a period prior to the time when the state became an owner—a period during which the property in question could not, constitutionally, have been exempted. So far is this claim of immunity from an observance of the requirement of uniformity that, construed as the plaintiff construes it, the statute would actually authorize, indirectly, the value of a lien for taxes to be converted into profits in the Bank of North Dakota to be credited to its farm loan department, while requiring the incidental corresponding deficiencies in revenues to be met by local taxpayers. Followed to its logical conclusion the plaintiff's main contention would justify the

taxing of a portion of the lands in taxing district to create a profit in the farm loan department of the Bank of North Dakota.

The argument is advanced that the legislature was confronted by a condition which had arisen out of numerous foreclosures that had ripened or were ripening into sheriff's deeds to lands upon which there were outstanding tax certificates and that it was reasonably to be inferred that the bond payment fund or the Bank of North Dakota, as an agency for conducting the farm loan business, would sustain losses if the tax certificates were not canceled. It is said that this condition presented to the legislature the alternative of appropriating moneys to take up the tax certificates or of canceling taxes and that, as a practical proposition, the legislature was free to choose either alternative. Having chosen the latter, it is argued that the legislative judgment is not subject to judicial review unless in making it effective the constitution has been infringed. Such argument depends largely for its validity upon its accuracy as a statement of the condition and of the alternatives which called forth the legislation in question. It does not appear that there had been any appraisal of prospective losses due to these foreclosures, nor, as previously remarked, does it appear that the cancellation of the tax certificate on a particular tract (if such be the direction) is made to depend upon whether the amount due on the certificate measures the loss upon the particular transaction. The security may be ample to satisfy both the certificate and the loan. Neither is it apparent to us that there was any impelling necessity for appropriating money to take up the tax certificates as an alternative to their cancellation, as will more fully appear in the later discussion with reference to the status of the lien of the tax certificates while title is in the state treasurer as trustee. The power to enforce the lien while the property is in public ownership may be suspended without affecting its validity or the right of the certificate holder to realize upon it against a subsequent purchaser of the property. Perhaps the best index by which to determine the true condition confronting the legislature at the time of the enactment of the statute in question is the scheme of operation contained in the legislation governing the state loan business.

Section 182 of the Constitution provides that the state may issue bonds but that bonds in excess of two million dollars shall be secured by first mortgage upon real estate in amounts not to exceed one-half

its value, etc. Chapter 154 of the Laws of 1919 authorizes the issuance of bonds of the real estate series and provides for assigning real estate mortgages to the state treasurer so that they may secure such bonds. The credit of the state is pledged in the issuance of these bonds, but they are required to be secured in the manner stated. The loans which are authorized by this same chapter are on the amortization plan and the payments into the hands of the treasurer are required to be credited to the real estate bond payment fund. It appears that the legislature in the beginning contemplated that situations might arise where the bond payment fund would be insufficient to meet the payments of interest or principal upon the bonds as they should mature, for in § 13 of the act it was made the duty of the state board of equalization "to include in the annual tax levy, such tax as in its judgment shall be necessary to meet the indicated deficiency," and the proceeds of such tax were required to be placed in the fund. The legislature also provided what should be done with a surplus in case the payments into the bond payment fund, together with mortgage securities on hand, would be more than sufficient to provide for the payment of bonds; it required (§ 14) that the excess of such funds requisite for that purpose should, at the direction of the industrial commission, be paid by the state treasurer to the Bank of North Dakota. This act, therefore, contains explicit directions for the determination each year of the amount of any loss to the fund which shall render it insufficient to meet its required obligations during the year and by authorizing a tax levy it supplies the means by which such loss is to be compensated. The act nowhere requires either the Bank of North Dakota or the state treasurer, as trustee, to take up delinquent tax certificates upon land to which title is acquired through foreclosure, and it is indeed difficult to understand how the fund is prospectively depleted through the existence of such liens, except as the value of the security is depreciated through the failure of the mortgagor to have met the proportionate burden of taxation which, under the constitution, must rest upon his land. Whether or not a loss will ultimately result is uncertain. The deficiencies in the fund which reduce it to the point where it cannot meet its annual burden of principal and interest are due to inadequate amortization payments, and such deficiencies would exist during periods of stress though the security of the mortgages for the loans should re-

main ample at all times. Under the plan outlined in the legislation referred to, it is difficult to see how the condition calling for legislation can be defined in the manner stated. There are cogent reasons why the local taxing districts would be desirous of having the lands redeemed where the certificates are in the hands of the county, but there is no apparent reason why the state (including the Bank of North Dakota and the state treasurer, as trustee), or any disinterested individual would desire the cancellation of the certificates so long as the security may be ample for both the loan and the certificate. On the other hand, if the security be inadequate for these purposes and a loss is inevitable in a particular case, if the plan of the original act be followed, it will be met by general tax levy. If such a loss can not be absorbed by a corresponding profit, it is open to grave question whether it may be made up at the expense of one or more local taxing districts, as would be the case if the outstanding tax certificates were canceled.

It is also suggested that the situation is somewhat analogous to a legislative permission granted to the owners of property to take up tax certificates in the hands of the county by paying within a given time the amount of the tax plus a rate of interest less than the interest and penalty, in lieu of the full amount of the tax, interest and penalty, as an inducement to redemption from tax liens. State ex rel. Atkins v. Lawler, 53 N. D. 278, 205 N. W. 880. Where this is done it is true that the full amount of the interest and penalty never finds its way into the public treasury, but at this point the analogy ceases. The inducement is held out in order to bring the tax moneys into the public treasury where they belong. It is a method of realizing upon the certificates where the county has not been able to realize upon them by sale and assignment. Clearly, a holding that this is within the range of legislative discretion does not require a further holding that the legislature may freely cancel entirely tax certificates without regard to their value, or transfer the lien represented thereby to some fund other than the revenue funds for which the taxes were originally levied.

There is embraced within every tax levy in this state taxes levied in pursuance of laws providing flat rates and specifying particularly the purpose or object for which the levy is made. If while such a tax remains collectible and while the original object continues unchanged and unaccomplished the lien representing the tax may be canceled and

its value be made to enhance a different fund, the spirit, if not the letter, of § 175 of the Constitution is flagrantly violated. This section plainly requires that no tax shall be levied except in pursuance of law, and that every law imposing a tax shall state distinctly the object of the same to which only it shall be applied.

What has been said above is not to be considered as an affirmative declaration that the act in question, construed in conformity with the plaintiff's contentions, is unconstitutional. We are of the opinion, however, that the analysis of the contentions advanced on behalf of the plaintiff and the logical results attendant upon their adoption raise serious question of the constitutionality of the act so construed. It is a sound rule of statutory construction, said to be elementary, that where a statute is susceptible of two constructions by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided it is the duty of courts to adopt the latter construction. Harriman v. Interstate Commerce Commission, 211 U. S. 407, 53 L. ed. 253, 29 Sup. Ct. Rep. 115; United States ex rel. Atty. Gen. v. Delaware & H. Co. 213 U. S. 366, 53 L. ed. 836, 29 Sup. Ct. Rep. 527; United States v. Gin Fuey Moy, 241 U. S. 394, 60 L. ed. 1061, 36 Sup. Ct. Rep. 658, Ann. Cas. 1917D, 854; Kennedy v. Commissioner of Corporations & Taxn. — Mass. —, 152 N. E. 747. This rule, in our opinion, being applicable, it is not our duty to first decide that the statute, construed as the plaintiff construes it, is unconstitutional. The statute is examined and analyzed only to determine whether grave constitutional questions arise. Cases, supra. In our opinion they do arise in the instant case.

Considering the inadequacy of the expression used in § 9, chapter 292, Session Laws of 1923, to express the rights claimed by the plaintiff in this case and the inaptitude of the terms employed to affect rights acquired under certificates of tax sale, as well as the incongruous, if not unconstitutional, operation of the statute, construed as the plaintiff construes it, we are of the opinion that the act is not to be construed as affecting rights acquired under outstanding tax certificates.

In construing § 9 of chapter 292, Laws of 1923, as above, we have not been unmindful of the fact that the entire act apparently had for its purpose the authorizing of a series of bonds independent of that authorized by chapter 154, Laws of 1919, and that it is not merely an

amendment of the earlier statute. Mortgages taken under the 1919 act, therefore, would be governed by its provisions instead of by the provisions of the 1923 law, and the 1919 act contains no direction to cancel any taxes. However, the section in controversy (Sess. Laws 1923, § 9, chap. 292) purports to apply to mortgages taken under the former act, as well as to those taken under the 1923 act. It directs the foreclosure "in case default shall occur in the payments or conditions of any mortgage, *heretofore or hereafter* taken. . . ."

However, it is earnestly argued that the statute in question should be given the broader construction contended for, in order to make it conform to the further mandate of § 176 of the Constitution that the property of the state shall be exempt from taxation. It is pointed out that, upon the acquisition of the property in question by sheriff's deed in foreclosure, it becomes the property of the state and as such is freed from all obligation to contribute to the tax burden, either past or prospective. Authorities are cited holding that property which is acquired by the state or by any of its political subdivisions for a public or governmental purpose is exempt from taxation either on common law principles, according to which a sovereign does not tax itself and its revenue laws are construed to apply to private property only, or in obedience to constitutional provisions expressly so declaring. A careful examination of these authorities will disclose that they proceed upon the principle that the functions of government should not be interrupted on account of the possible failure of officers to safeguard the title to property acquired for the purpose of facilitating a given governmental activity. The futility of levying a tax to pay a tax is also frequently commented upon. But it is our conclusion based upon a careful examination of all of the authorities cited that none goes so far as to declare the interest of the state in property which is acquired as a mere incident to the pursuit of a governmental function to be superior to claims of third parties based upon anterior tax liens. The ability with which these authorities are analyzed and the commendable zeal with which they are urged upon us, as well as the importance of the question involved, seem to us to justify the inclusion in this opinion of a brief abstract showing the holdings therein. We think that a careful consideration will demonstrate that the question involved here was present in none of the cases and that this case is sui generis.

Santa Monica v. Los Angeles County, 15 Cal. App. 710, 115 Pac. 945, was an action brought by the city of Santa Monica to recover taxes for the year 1903, which taxes it had paid under protest. The lien of the taxes for the year 1903 attached as of the first Monday of March, regardless of the actual date of the assessment. The city acquired the property in question after this date but before the assessment was levied. It was held that the plaintiff took the property subject to the lien for county purposes the same as would a private purchaser; that the lien of the county for taxes was not merged in the title taken by the city and, consequently, when the city paid the taxes it was merely discharging an obligation incident to the ownership of the property and it could not recover back the amount so paid. It was said that the plaintiff, by its organization as a part of the state government, had not been vested with power to aid the state in connection with county government or school government under the control of the county authorities and that the taxes so levied upon the property were levied by the county for purposes within its jurisdiction.

In Smith v. Santa Monica, 162 Cal. 221, 121 Pac. 920, the plaintiff sought to quiet title to property to which he held a tax deed. The taxes for which the property was sold were those of 1894 and 1895. The tax deed was executed on June 10, 1908. The claim of the defendant city was based upon condemnation proceedings instituted in 1895, in which judgment in favor of the city was entered on December 20, 1897, nine years prior to the tax deed. It appears that the state had become the purchaser at the tax sale prior to the date of the judgment in the condemnation case, but it did not attempt to realize upon its lien until some nine years thereafter. The court put the proposition thus: That the state in seeking to enforce the payment of state and county taxes was selling the public property of one of its agencies. It comments on the folly of a sovereign taxing its own property and taking money out of one pocket to put in another. It relies upon its earlier construction of the provision of the Constitution in People v. Doe G. 1,034, 36 Cal. 220, to the effect that the Constitution and laws with reference to the taxing of property are to be understood as referring to private property and as not including the public property, either of the state or of its subordinate municipal corporations. The court holds that when a municipal corporation acquires property the title which the

state takes by the tax collector's deed is merged in the larger title which the municipality holds under the trust for the public. In conclusion it is held that the controller's order to the tax collector in 1908, to dispose of and transfer the property, was without authority of law and void.

In Webster v. University of California, 163 Cal. 705, 126 Pac. 974, there was involved the title to a tract of land upon which the board of regents of the state university had foreclosed a mortgage, the plaintiff claiming title through tax deed from the state. The mortgage was given to the regents in 1890 and duly recorded. The taxes which had become delinquent were taxes for the year 1896. The lands were conveyed to the plaintiff by tax deed on April 18, 1905. At the time of the conveyance there was pending an action to foreclose the mortgage owned by the regents. Judgment had been entered in this action on January 19, 1905, and in pursuance of the judgment the lands were sold on May 16, 1905 to the regents, approximately a month after the tax deed to the plaintiff. There was no redemption from the mortgage foreclosure sale and it was followed by a deed to the regents dated September 28, 1905. The court held the title to be in the regents.

At the time of the assessment of the taxes, there was in force in California a constitutional provision segregating the interests of the mortgagor and mortgagee for purposes of taxation. Under this provision the mortgage interest of the regents could not be taxed for the taxes of 1896, because this interest belonged to the state and was exempt by virtue of that provision in the Constitution exempting property belonging to the state. Therefore, the tax sale carried to the purchaser only the interest of the mortgagor, and the title conveyed by the tax deed was a title subject to the mortgage.

In Reid v. State, 74 Ind. 252, the action was brought to recover possession of lands claimed by the plaintiffs as alien heirs of alien ancestors. The defendant claimed under tax title. The state intervened, claiming title to the lands by escheat. The state substantiated its claims as against the heirs of the alien, the lands becoming vested in the state by escheat on the 10th day of January, 1860. The tax title was based upon a sale in 1862 to pay the delinquent taxes for the years 1859, 1860 and 1861. The holding was to the effect that any assess-

ment of taxes upon the land or its sale for delinquent taxes after January 10, 1860, was void as against the state.

In Flanagan v. Land Development Co. 145 La. 843, 83 So. 39, the only applicable holding is a holding by the trial court, approved by the supreme court, to the effect that a city could not in 1910 sell property for its taxes for the year 1908, which property was held by the state on account of the nonpayment of its taxes in 1909.

Foster v. Duluth, 120 Minn. 484, 48 L.R.A.(N.S.) 707, 140 N. W. 129, involved an attempt to realize on a tax lien against property acquired for a public purpose. On July 17, 1905, one Galusha conveyed certain lots to the city of Duluth and soon thereafter the city constructed thereon an incinerator for the disposal of garbage. The plaintiff held certain tax certificates issued pursuant to a tax judgment rendered in 1907 for the taxes for the year 1905. The lien for the 1905 taxes attached as of May 1st, more than two months prior to the conveyance to the city. The court held the property not subject to taxation after it became public property devoted to public uses, saying that it would not be subject to taxation in the absence of constitutional or statutory provisions making public property subject to the tax laws of the state. It also held that it was equally well established that proceedings for the assessment of taxes on public property or for their collection by judgment and sale are absolutely void, and these proceedings were void notwithstanding that the taxes for the current year may have been a lien on the property before its transfer. The court said it did not follow that because there was a valid lien the proceedings to enforce the lien were valid, and further remarked that it was not important what became of the lien; that they did not consider whether it still existed as an enforceable lien, whether the plaintiff was entitled to refundment, or whether the lien was merged in the fee title. All that was decided was merely that, after the property was purchased by the city for a public purpose, all proceedings to enforce and collect the taxes were void.

Laurel v. Weems, 100 Miss. 451, 56 So. 451, Ann. Cas. 1914A, 159, Weems filed a bill to quiet title to a certain lot. The city of Laurel set up its ownership. Weems claimed a tax title by virtue of the purchase at tax sale on March 4, 1907. Taxes were assessed in 1906, and on the 20th of March, 1906, the property was conveyed by the owner

to the city of Laurel, the deed being recorded on May 17th. It was for the 1906 taxes that the property was sold on March 4, 1907. Under the Mississippi statute, a lien for taxes for a given year attached on the first of February, and the contention was that this lien for the taxes of 1906 did not abate when the city purchased the property. The court held that after a municipality purchased a lot the tax officers could not take any further steps looking toward the collection of the taxes; that the subsequent sale was a nullity and that the purchaser acquired no title. The bill was dismissed.

Public Schools v. Trenton, 30 N. J. Eq. 667, involves a question of priority as between a mortgage and certain taxes of the city of Trenton under the following facts: The mortgage in question was held by the trustees for the support of the public schools. It represented security for a loan of the public school fund which was made in 1861. The action was to foreclose the mortgage, and the city of Trenton interposed a claim of priority of lien based upon taxes upon the mortgaged premises assessed in the years 1875, 1876 and 1877. Under the charter of the city taxes were made a first lien on the premises, although by a general statute in the state they were a lien only upon the estate which the owner had at the time of the assessment. It was held, however, that by a subsequent constitutional provision requiring property to be assessed under general law and uniform rules the priority provision of the Trenton charter was not abrogated; but it was further held that such charter provision, while giving to the city a lien for taxes prior to the lien of antecedent mortgages held by individuals, did not apply in such a manner as to preclude the trustees of public schools from foreclosing the mortgage as a first lien. It was said that the moneys represented by their mortgage were not legitimately subject to taxation by the city and are excluded from the class of property over which the city's power of taxation extends; that if the securities of the state were subject to priority of lien, their value would be destroyed by the failure of their agents to make redemption of the premises from sale. In the course of the opinion, however, the court said: "In some respects the state is not endued with the prerogatives of the king. Where the state goes into the market for the investment of money, it takes its securities subject to the vested rights of property of private individuals. This must necessarily be so under a government which protects private prop-

erty against the state by constitutional prohibitions. Consequently, a mortgage given to the state or its representatives for public moneys, will be subject to all prior estates in the mortgaged premises, and all liens and encumbrances thereon actually vested antecedently in private individuals." It should be remarked that the school fund in New Jersey was protected by the constitution by being made a perpetual fund which was required to be securely invested and which the legislature was not competent to appropriate for any other purpose than the support of the public schools, and this was commented upon in the opinion.

State v. Locke, 29 N. M. 148, 30 A.L.R. 407, 219 Pac. 790, involves the validity of a tax deed which was issued pursuant to a tax sale for the taxes of 1909. The premises, however, were acquired by the state during the year 1910 and the tax deed was issued on June 1, 1914. The court states the question to be whether or not the acquisition of the property by the state frees it of existing liability for taxes then levied, due and unpaid. The court commented on the futility of taking money out of one pocket and putting it into another and upon the danger that the public might lose its property entirely through oversight of its agents in failing to pay taxes, and held that when property is acquired by the state in its sovereign capacity, it thereupon becomes absolved, freed and relieved from any further liability for taxes previously assessed against it and which are unpaid at the time it becomes so acquired; that, from the moment of its acquisition, the power to enforce the lien is arrested or abated. The claim of the state for such taxes becomes merged in its ownership of the fee.

In the case of Hughes County v. Henry, 48 S. D. 98, 202 N. W. 286, a rural credit loan of $10,000 had been made July 1, 1922, on a section of land. The 1922 taxes were not paid and in December, 1923, the property was sold to the county for want of bidders and a tax sale certificate issued; neither were the taxes paid for 1923. The action was mandamus to compel the rural credit board to pay the taxes. The rural credit act did not specifically direct the board to pay the taxes, but it provided that taxes paid by the mortgagee should become part of the mortgage debt. The court discussed the relative standing of the lien of the mortgage and the lien for the taxes and held that the statute, similar to our § 2186 of the Compiled Laws of 1913, which makes taxes

a perpetual lien against all persons and bodies corporate, except the United States and the state, did not make the tax lien subordinate to the state's mortgage lien, but it "merely provides that the tax lien is not superior to the mortgage lien." The court held that it appeared that the legislature had not attempted to make the lien of the taxes subordinate to the lien of rural credit mortgages; that the payment of taxes was an incident to the making of the loan; that the board had power to pay taxes and should be required to do so.

In a concurring opinion in the above case, Mr. Justice Sherwood expressed somewhat stronger views than those embodied in the opinion of the court. He presented the issue as a challenge to the most important sovereign power of the state, that to tax and to collect taxes, saying at page 290:

"The conflict here is plainly between the state in its general sovereign taxing power and a mortgage made by a minor subdivision of the same state, and it seems clear that the power and lien created by the state must be greater than that created by such subdivision.

. . . When the state engaged in the business of making rural credit loans, it was clearly not acting in its sovereign capacity, but was engaged in the business of loaning money in competition with other citizens of the state."

He then proceeded to quote the statement of Chief Justice Marshall in Bank of United States v. Planters' Bank, 9 Wheat. 904, 6 L. ed. 244, as follows:

"It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. Thus many states of this Union, who have an interest in banks, are not suable even in their own courts; yet they never exempt the corporation from being sued. The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never

exercises its sovereignty. . . . The government, by becoming a corporator, lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter." (Citing cases.)

Under the reasoning of this opinion, the exercise of the sovereign power of txation is dignified above the action of the state when engaged in a business not directly involving sovereign prerogatives. To concede priority to the mortgage over the tax has an effect on sound government under well defined constitutional principles similar to effects produced in the physical realm by inverting a pyramid.

In Gasaway v. Seattle, 52 Wash. 444, 21 L.R.A.(N.S.) 68, 100 Pac. 991, it appeared that the city of Seattle has acquired three tracts of land by condemnation proceedings, one in July, 1896, and the others in 1901. The value of the property was paid into court and in turn paid over to the assignee of the owner. At the time of the condemnation proceedings certain taxes had been levied which were then delinquent. In one of the suits the county was made a party. Later the county brought an action to foreclose its lien for taxes including therein the land which had been taken by the city in the condemnation proceedings and which was then in its possession. The court stated that the only question for it to decide was whether the tax lien of the county was superior to the right of the city to condemn and take the property for public use. It appears that the lower court, in deciding the case for the plaintiff, had followed the earlier case of Puyallup v. Lakin, 45 Wash. 368, 88 Pac. 578, which was decided prior to the adoption of an amendment governing condemnation suits. It was then held that under the amendment the question was resolved to whether the county, by reason of its tax lien, is a person having an interest in the land within the meaning of the act, and it was said that the statute was drawn on the theory that a municipal corporation exercising the sovereign power of the state could take land under the power of eminent domain without regard to taxes or tax liens; that under it the city could exercise the full power possessed by the state and that, as the state had full power to fix the subjects of taxation and to exempt property, it could take away both the power to tax and the subjects of taxation, and that no person or municipality could acquire as against the state a vested right of taxation or the right to insist upon the collection of

them when levied; and that, since the city in the condemnation proceedings had acted as an arm of the state government, it acquired the lands in such circumstances that its enjoyment could not be taken away, nor its use impaired, by a sale to satisfy a tax; and that the tax lien was not paramount to the right of the state to abolish it.

In State v. Snohomish County, 71 Wash. 320, 128 Pac. 667, the action was brought by the state for the cancellation of tax certificates upon, and to quiet its title to, lands which it had purchased as a site for the state reformatory. It appeared that the land was purchased on May 8th and August 9, ·1907; that on July 1, 1909, the county treasurer issued the certificates of delinquency in question for the taxes upon one quarter section for the year 1907, and upon the other for the year 1908. It was agreed that the complaint stated a cause of action in relation to the taxes for the year 1908 and that a demurrer to the complaint might be considered as applicable to the taxes for the year 1907 alone. The lower court sustained the demurrer, thus upholding the claim of the holder of the tax certificate. The question was stated as being whether or not the real estate in private ownership on March 1st of the given year, but which had passed into public ownership when the taxes for that year were levied, might be subjected to the payment of the tax. In deciding this question, the court so construed that provision of the statute which dates the tax lien from the first of March in each year as presupposing that a valid levy affecting the particular property can and will be made following the general taxation law, and that since, both under general principles and under the state Constitution, property of the state was not subject to taxation, all steps taken to subject it to a tax lien after August 9, 1907, were unauthorized; that at that time "the developing process of imposing the tax as a valid creation was arrested." It was held that the lien was only inchoate on March 1st and since the property had passed into public ownership at such time as to prevent the inchoate lien from maturing, the tax certificate based upon the 1907 tax would not constitute a valid and enforceable lien on the property.

In our opinion, the considerations that support the title and right of the state or public corporations in the above cases as against claims based upon prior taxes are not present in the instant case. The property acquired by the state treasurer in trust in the instant case is not

acquired for a public purpose. The constitutional exemption was clearly intended to protect property that was acquired for a public purpose. It was placed in the Constitution at a time when restrictions were imposed upon governmental activities in the direction of private enterprise. See § 185 of the state Constitution, 1889. When the state engaged in the farm loan business, it was not in contemplation that any real property should be acquired to facilitate the operation of the department. A state reformatory, a school, a waterworks or an incinerator can not be operated apart from the land upon which it is located, but the more successfully a farm loan business is operated, the less the likelihood that any real property will ever be acquired. And when property is acquired in the manner directed by the statute, it is to be held temporarily only. The direction is to dispose of it in order to realize its worth as security. Clearly, the underlying public policy which protects public property from the hazards of tax proceedings is not present to any appreciable extent where the property is held temporarily for such a limited purpose. The State, in the end, is not embarrassed to any greater extent than private lenders in realizing the full value of the property. The loan was originally made on the basis of the property continuing to be subject to taxation, and there is no just reason why the position of the lender should later be arbitrarily improved, especially when this is done at the expense of a limited group of taxpayers as distinguished from the taxpayers in general. So far as the danger of loss of the property through tax proceedings is concerned, it might well be protected during the period of state ownership by considering the lien dormant; or the possibility of such loss might well be considered as an incidental hazard and within legislative contemplation when the state was directed to engage in the business of loaning money upon terms that made the adequacy of its security at all times subject to human judgment, business acumen and foresight. (But we are not called upon to determine which of these alternatives was contemplated.) We are unable to harmonize the high conception of sovereignty, which lies back of the protective doctrine of immunity, with a departmental activity in a business enterprise where success is so largely dependent upon administrative discretion and judgment. Why should the attribute of sovereignty be invoked to avoid a loss (or to make a profit; for it may so result) under a law that outlines many

situations requiring official and quasi-official action in connection with the same business that are fraught with the possibilities of losses (or profits?) many times as great as usually attach to a mere tax matter on individual tracts? The state and its agencies and departments are not always synonymous where questions of sovereign attributes are concerned. Sargent County v. State, 47 N. D. 561, 182 N. W. 270. Under such a law the reasons for the immunity have largely ceased and ratio est legis anima, mutata legis ratione mutatur et lex.

While it is argued that § 176 of the state Constitution, declaring that the property of the state shall be exempt from taxation, so operates to remove automatically all tax liens existing at the time the property is acquired, we find no substantial support in the authorities for such a construction. Its language is prospective. It does not purport to control the effect of the acquisition of title upon existing liens, and it is only upon the principles heretofore in this opinion stated that existing liens have been held to be extinguished or rendered dormant. We are of the opinion that this section does not have the force contended for as to existing liens. In this connection may be noted also that other provision of the Constitution (§ 22) which declares "Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct" and § 8175 of the Compiled Laws of 1913, which authorizes suits against the state "respecting the title to property, or arising upon contract. . . ." We do not hold that suits may be instituted upon the tax certificates held by the county. We hold only that the prior taxes should not be abated or canceled.

It is suggested that the legislature when amending and re-enacting the statute under consideration in 1925 (see chapter 100, Session Laws of 1925) refused to so amend § 9 as to strike therefrom the clause providing for the abatement and cancellation of unpaid taxes (House Bill 185—indefinitely postponed) and further refused to pass a bill providing for the payment of existing tax liens (Senate Bill 149, 1925 session), it evidenced a purpose to have all tax liens wiped out. Such legislative action is at most equivocal as an expression of legislative intent. On the one hand, it is wholly consistent with our construction of the 1923 act, in that the subsequent legislature might well have considered the previous legislation an adequate direction to cancel the un-

paid taxes for which the property had not been sold and which were not included in the certificates; and, on the other hand, it might further have been unwilling either to embarrass the Bank of North Dakota by requiring taxes to be paid, or the certificates to be taken up, or to, at that time, increase the general tax burden by appropriation for that purpose. In any event it is but an equivocal expression or lack of expression by a subsequent legislature.

It may be remarked in this connection too that had there been any doubt, prior to 1925, as to the authority of the Bank of North Dakota to pay delinquent taxes upon lands upon which it had negotiated loans, that doubt was removed by the amendment to § 9. See chapter 100, Laws of 1925. By the amendment the bank was authorized to include in the foreclosure "all legal costs and disbursements incurred, *including all taxes paid by said bank.*" This is not a direction to pay but a clear recognition of the right of the bank to pay and to recover the amount paid in the foreclosure proceedings. If, in the event of sheriff's deed in foreclosure issuing, all outstanding tax liens are arbitrarily canceled, it is somewhat singular that the bank would be authorized to pay taxes which could never jeopardize the security for its loan. The 1925 amendment, as we view it, is rather an indication that the direction to cancel unpaid taxes was limited to those accruing after the foreclosure of the mortgage.

Concerning the cancellation of the taxes which were not due at the time the property was transferred to the state treasurer, as trustee, under the sheriff's deed in foreclosure, we are of the opinion that this question is controlled by § 176 of the state Constitution which exempts the property of the state from taxation. Under such a provision the ownership and not the use to which property is put, nor even the purpose for which it is acquired, affords the test of its immunity. San Francisco v. McGovern, 28 Cal. App. 491, 152 Pac. 980; Colorado Springs v. Freemont County, 36 Colo. 231, 84 Pac. 1113; Walden v. Whigham, 120 Ga. 646, 48 S. E. 159; Sumner County v. Wellington, 66 Kan. 590, 60 L.R.A. 850, 97 Am. St. Rep. 396, 72 Pac. 216. These taxes accrued after the sheriff's certificate of foreclosure sale had been issued, and we have no doubt that it was competent for the legislature, under the liberal construction of constitutional provisions expressly

exempting property owned by the state, to provide for the cancellation of such taxes.

There is yet another class of taxes involved in this case, namely, taxes which were delinquent and for which the property had not been sold. Under the law governing tax sales (Comp. Laws 1913, § 2191), when property is once bid in by the county it is not again offered for sale for subsequent taxes unless the county has made an assignment of the certificate. This statute and the sections governing redemption clearly have the effect of including in the tax certificate held by the county at the date of delinquency all subsequent taxes on the property. In other words, the county as a certificate holder draws to itself the lien of the subsequent unpaid taxes without the formality of a sale. Since its right to hold the property for this amount subject to redemption is included in the certificate, and since there has been no apparent attempt to qualify its rights as a certificate holder, the taxes which became delinquent before the sheriff's deed was issued should not be canceled.

For the foregoing reasons, we are of the opinion that the judgment of the trial court is correct and it is affirmed.

Burke, Burr, and Christianson, JJ., concur.

Nuessle, J. (dissenting). I am unable to agree with the conclusion reached in the majority opinion in this case. I am reluctant to continue a discussion already somewhat extended but the case is of such importance that I deem it my duty to set forth as briefly as possible some of the reasons for my disagreement.

The plaintiff contends that under § 9, chapter 292, Sess. Laws 1923 and § 176 of the Constitution of the state of North Dakota, the lien of Burleigh county for taxes is discharged as against real property acquired by the state treasurer as trustee on foreclosure under the provisions of said chapter 292 regardless of the time when such tax liens attached. On the other hand, the defendant contends that the exemption of State property from taxation under § 176 of the Constitution does not apply to property thus acquired and that the provisions of chapter 292, supra, relied upon by the plaintiff are unconstitutional and void; that if the exemption of § 176 does apply to such property it does so apply only as to taxes, the lien of which had not attached at

the time the state treasurer acquired title, and as to all other taxes this provision of chapter 292 is unconstitutional and void in that it is in contravention of the first clause of § 176 of the Constitution providing that taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax.

Section 176 of the Constitution, as amended, reads as follows:

"Taxes shall be uniform upon the same class of property including franchises within the territorial limits of the authority levying the tax. The legislature may by law exempt any or all classes of personal property from taxation and within the meaning of this section, fixtures, buildings and improvements of every character, whatsoever, upon land shall be deemed personal property. The property of the United States and of the state, county, and municipal corporations and property used exclusively for school, religious, cemetery, charitable, or other public purposes shall be exempt from taxation. Except as restricted by this article, the legislature may provide for raising revenues and fixing the situs of all property for the purpose of taxation. Provided, that all taxes and exemptions in force when this amendment is adopted shall remain in force until otherwise provided by statute."

See chapter 90, Sess. Laws 1919. That portion of § 9, chapter 292, Sess. Laws 1923, which especially requires consideration in this case, reads as follows:

". . . . In case no redemption is made from such foreclosure sale (by the manager of the Bank of North Dakota as agent of the state treasurer as trustee for the state of North Dakota on default of the mortgagor) in a manner provided for by law, a sheriff's deed shall be issued to the 'state treasurer as trustee of the state of North Dakota.' Any taxes then remaining unpaid thereon shall be cancelled and abated by the board of county commissioners of the county wherein such land is situated."

Section 185 of the Constitution as amended provides:

"The state, any county or city may make internal improvements and may engage in any industry, enterprise, or business, not prohibited by article 20 of the Constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or any aid to any individual, association or corporation

except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation."

See Chapter 89, Sess. Laws 1919. Pursuant to § 185 of the Constitution as above quoted, the legislature enacted chapter 147, Sess. Laws 1919, establishing a bank under the name of the "Bank of North Dakota," to be operated by the state, and authorizing it to make loans to be secured by first mortgage on land. Chapter 154, Sess. Laws 1919, provides for the issuance, by the state of North Dakota, of bonds in a sum not exceeding $10,000,000, to be known as "Bonds of North Dakota, Real Estate Series," for the purpose of raising money to enable the Bank of North Dakota to make loans upon real estate mortgages as authorized by chapter 147, supra. Both chapter 147 and chapter 154 were considered by this court in the case of Green v. Frazier, 44 N. D. 395, 176 N. W. 11, and were held to be constitutional and valid enactments. That case also determined that the enterprises therein contemplated and thereby provided for and established were public purposes. Chapter 292, Sess. Laws 1923, supra, is supplementary to chapter 154, Sess. Laws 1919, as amended. Pursuant to the provisions of chapters 147 and 154, Sess. Laws 1919, the Bank of North Dakota made the Nestor Rutanen loan, out of which this controversy grew, and assigned the same to the plaintiff state treasurer as trustee for the state of North Dakota.

The Bank of North Dakota is merely the agency of the state, created for the purpose of carrying out the objects sought to be accomplished by the state. See Sargent County v. State, 47 N. D. 561, 182 N. W. 270. The bank was authorized to make loans to be secured on real estate. Sess. Laws 1919, chap. 147. The state provided funds wherewith to do this through sale of its bonds. Mortgages thus taken by the bank were to be assigned to the state treasurer, as trustee for the state, as security for such bonds. Sess. Laws 1919, chap. 147. The mortgage taken by the bank to secure the Rutanen loan consonant with these provisions was assigned to the state treasurer as trustee for the state of North Dakota. When, on default by Rutanen, this mortgage was foreclosed and sheriff's deed issued thereunder to the plaintiff state treasurer as trustee for the state, the state of North Dakota became the owner of the beneficial interest in the real property thus acquired, the naked legal title remaining in the State Treasurer as a matter of convenience.

This ownership and condition was brought about in the manner and through the agencies appointed by legislative enactment in accomplishing purposes declared and held to be public. The Constitution, § 176, supra, expressly exempts property of the State from taxation. This exemption appears in the statute in § 2078, Comp. Laws 1913, as amended by chapter 223, Sess. Laws 1919. There is no limitation upon the exemption by restricting it to such property as may be used for public purposes. All property of the state is exempt. It has been generally held that under an exemption clause of this broad character the use to which the property may be or is put is immaterial so only that it is property of the state. See Cooley, Taxn. § 638, and cases cited. So it is clear that from the moment when the state treasurer, as trustee for the state of North Dakota, acquired title to the land here involved by virtue of the sheriff's deed issued pursuant to the foreclosure, such real estate became and was wholly exempt from taxation. '

The question presented on this appeal, however, involves taxes which had attached to the land prior to the time when the trustee acquired title thereto as well as those which thereafter became due and delinquent. The contention is raised, and the majority opinion so holds, that the legislature by the enactment of the particular portion of § 9, chapter 292, Sess. Laws 1923, heretofore quoted, had in mind only taxes the lien of which had not attached at the time the trustee acquired title to the property sought to be charged. I think, however, that there is no foundation for this contention. The statute reads "Any taxes then remaining unpaid thereon shall be cancelled and abated." It seems plain that the legislature intended thereby to clear the record of all unpaid taxes without reference to the dates when the same might have been levied or might have become due. The fact that in the process of collection of taxes land charged therewith is sold to the county at tax sale does not change the character of the lien. Purchase by the county at tax sale does not result in payment of the tax. It is simply a step in the process of collection. See State ex rel. Atkins v. Lawler, 53 N. D. 278, 205 N. W. 880; Hughes County v. Henry, 48 S. D. 98, 202 N. W. 286. It is argued that had the legislature here contemplated the cancellation and abatement of taxes the lien of which had attached, it would have said so in no uncertain terms, and that this is so particularly as regards taxes which had gone to sale and had been

bid in by the county. But it seems to me that the language as used is certain and unambiguous. The legislature in other statutes has used the terms "abatement" and "delinquent taxes" respecting taxes bid in by counties at tax sale. See § 2165, Comp. Laws 1913 and chapter 227, Sess. Laws 1917, amendatory thereof. In the statute here under consideration the legislature was dealing with taxes which had not yet gone to sale as well as those which had gone to sale, and so there was no need to distinguish one from the other by particular reference. The majority opinion holds that for all practical purposes taxes are paid when the property is offered at tax sale and sold to the county, though no money is paid or received and none of the tax beneficiaries receive any fruits resulting from the sale until money is realized by the county, either through a redemption, from an assignment of the certificate, or from a sale of the land after it shall have gone to deed. In this connection it is to be noted that the statute under which property is sold and bid in by the county (Comp. Laws 1913, § 2191), also provides that such property shall not again be sold or offered for sale for subsequent taxes so long as the county holds the certificate. By inference only, the county has a lien for all unpaid subsequent taxes without sale and the same must be paid when a redemption is made. See § 2197, Comp. Laws 1913. Now under such circumstances without even the formality of a sale or the pretence of a payment, how can such subsequent taxes be said to be paid? If it be held that purchase by the county at tax sale results in a payment, how can it be held that this payment is a payment not only of the taxes for which the property is sold, but also of all subsequent taxes which are not otherwise discharged? And if it be held that it is a payment of such subsequent taxes, when is that payment made? When they are levied and assessed and become liens on the property, when they become due, when they become delinquent, or at the time of the next succeeding tax sale? Why should a tax be held to be paid at the time of sale rather than when it becomes a lien, or becomes due, or becomes delinquent? On the other hand if a tax on land is paid the moment that it becomes a lien on the land in those cases where the county holds a certificate of sale on account of a prior tax, the provision of § 9, over which this controversy has arisen, becomes futile and absurd. This result is well illustrated in the instant case.

When the State of North Dakota took title to the land involved in October, 1924, the taxes for 1924 had been levied and assessed. They were spread against the property. The amount thereof was determined. The tax was then a lien against the land to the extent that the land was, under the circumstances, subject to tax. The 1923 taxes were in a similar case in October, 1923, when the land was sold on foreclosure and bid in by the State. These 1923 taxes became due on December 1st, 1923. They became delinquent on March 1st, 1924. The land would not have been subject to sale on account of such taxes until the first Monday in December, 1924. Now these 1923 taxes were a lien on the land when the state acquired its foreclosure certificate of sale just as much as when it acquired its deed, but no more so than the 1924 taxes were a lien on the land at the time the state acquired its deed. Yet, the majority opinion reasons that in the one case—that of the taxes of 1923—such taxes were, in the contemplation of the legislature as expressed in § 9 of chapter 292, Sess. Laws 1919, paid at that time, but that the taxes for 1924 which were just as much a lien, were not paid, and that therefore the legislative intent was that only those taxes which were levied and assessed during the year of redemption should be cancelled and abated. Surely if the legislature intended such a remarkable distinction it would have expressed that intention in appropriate language and not have left it to tenuous inference. The whole purpose of statutory construction is to discover and apply the legislative intent. It is to be presumed that in enacting a statute the legislature acted with deliberation and intended to attain only reasonable results; that it did not intend its action should be futile or result in absurdities. It seems to me that this presumption alone justifies the construction that I am contending for. This construction is further warranted by the action of the legislature in 1925. The legislature then re-enacted the statute here under consideration. See chapter 100, Sess. Laws 1925. That same legislature refused to amend the statute (Sess. Laws 1923, § 9, chap. 292), by striking therefrom the clause providing for the abatement and cancellation of unpaid taxes. House Bill 185—indefinitely postponed. It also refused to pass an act providing that where title is acquired by foreclosure, in cases identical with the instant case, the tax liens existing at the time when title was so acquired should be paid and discharged by the state. (Senate Bill 149—withdrawn by its

author with the consent of the Senate). I know that ordinarily the refusal of the legislature to enact a bill into law is not entitled to great consideration in the construction of statutes which are enacted, but I think that the circumstances in this particular case are such as to give the action of the legislature in these respects considerable significance. So it seems to me to be beyond question that § 9, chapter 292, Sess. Laws 1923, here in question, was enacted and re-enacted for the purpose of clearing the record of tax liens imposed on real property to which the state later acquired title by mortgage foreclosure in those cases where such tax liens were held by the state itself.

The defendant contends that so construed the statute is unconstitutional and void in that it is in contravention of the first clause of § 176 of the Constitution, heretofore quoted, providing that taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax. This contention so impresses the majority of the court that they on that account shrink from giving the statute an interpretation which to me seems obvious. It is urged that under the requirement that taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax, such uniformity must be determined as of the date of assessment and levy; that at the time the taxes here involved were assessed and levied this property was owned by Rutanen, and that such taxes were required to be assessed and levied against the property uniformly with those assessed and levied against real estate owned by other individuals in the same taxing district; that to now cancel and abate these taxes because subsequently the state acquired title to the land has the effect of increasing the tax burden imposed as of that time on real estate held by other individuals, and absolving that of Rutanen from all tax burden; that the revenues required to be raised by taxation as of that time were necessary for the conduct of the affairs of the various governmental units sharing therein, and that the same have been, though not collected, anticipated and spent in reliance upon the assessment and levy, and the machinery provided for the collection thereof; that to cancel and abate such taxes will disrupt the whole scheme of uniformity of taxation; that it will hamper the collection of taxes on real estate through and by means of tax sale. .

. . When analyzed these contentions appear to be aimed at the wisdom

of the legislature in enacting rather than at the power of the legislature to enact. The question here is not a question of legislative wisdom but one of legislative power. If the power exist this court may not hold the statute unconstitutional, even though it deem the statute unwise and inexpedient. This court must as a matter of duty sustain the statute unless it is clearly unconstitutional. While the court must, if reasonably possible, give it that construction which will render it constitutional, yet there is no obligation to distort the statute in order to avoid passing upon its constitutionality. Given that construction which it seems to me the legislature plainly intended should be given to it, I can see no sufficient reason for holding that the statute violates the uniformity clause of § 176 of the Constitution.

The legislature is the agency of the people. To it is delegated the power of taxation. It has, as such agency, the right and power to do as it will respecting matters of taxation, excepting only as it is restrained by constitutional inhibition. It is otherwise supreme. It may impose taxes or it may exempt from taxation, subject only to such restraint. In the exercise of the power thus delegated the legislature enacted the statute here challenged. It must be borne in mind that all the taxes here involved were assessed, levied, and became liens on the land subsequent to the time when the Bank of North Dakota made and assigned the Rutanen loan. The legislature, unquestionably, has the power to charge real property with a lien for the taxes imposed thereupon superior to that of any pre-existing lien; whether by mortgage or otherwise. But, on the other hand, it is equally competent for the legislature to subordinate such tax lien to pre-existing liens. See Cooley, Taxn. § 1240, and cases cited; 27 Cyc. 1176, and cases cited.

I have heretofore made reference to that part of § 176 of the the Constitution exempting from taxation property of the United States and of the state, county, and municipal corporations. As hereinbefore shown, under this broad exemption, enacted into the statute in § 2078, Comp. Laws 1913, as amended, all property of the State is exempt without distinction based on the use to which it may be put. This constitutional exemption from taxation is not peculiar to our Constitution, but is common to nearly all the state constitutions. Under it, whether reinforced by statutory enactment or not, it has generally been held that the exemption is so broad as to apply to property acquired by the state

or its agencies even after the tax lien has passed into private ownership. See Smith v. Santa Monica, 162 Cal. 221, 121 Pac. 920; Webster v. University of California, 163 Cal. 705, 126 Pac. 974; Flanagan v. Land Development Co. 145 La. 843, 83 So. 39; Foster v. Duluth, 120 Minn. 484, 48 L.R.A.(N.S.) 707, 140 N. W. 129; Laurel v. Weems, 100 Miss. 335, 56 So. 451, Ann. Cas. 1914A, 159; Public School v. Trenton, 30 N. J. Eq. 667; State v. Locke, 29 N. M. 148, 30 A.L.R. 407, 219 Pac. 790; Gasaway v. Seattle, 52 Wash. 444, 21 L.R.A.(N.S.) 68, 100 Pac. 991; State v. Snohomish County, 71 Wash. 320, 128 Pac. 667.   In none of these cases was the right of the state to avoid the lien or to resist its enforcement challenged as violating the constitutional requirement of uniformity of taxation though the several constitutions contained provisions almost identical with the uniformity clause of § 176, supra, on which the argument set out in the majority opinion is predicated.

It is urged that in the cases cited, the purposes for which the property was acquired and used were purposes distinctly public and necessary to the carrying on of the proper functions of the state.   However, if that be material, the loaning of money on real estate to its citizens has been declared to be a public purpose by the people of the state of North Dakota.   That it is a proper public purpose is no longer open to question.   Green v. Frazier, 44 N. D. 395, 176 N. W. 11.   See also Paulus v. State, 52 N. D. 84, 201 N. W. 867.

There is no ground for distinction between one public purpose and another; between the loaning of money and the furnishing of light or water, or the performance of any other of those functions which have come to be recognized as public and governmental.   Furthermore, it seems to me that the majority opinion somewhat misconceives the situation.   When the State of North Dakota received the Rutanen mortgage by assignment from the Bank of North Dakota that mortgage became a part of the bond payment fund, as much the property of the state as were any other mortgages in which any other of the state's sinking funds were invested.   The loan to Rutanen was made by the Bank of North Dakota.   Whether that bank was or was not synonymous with the state of North Dakota in so far as questions of sovereign attributes are concerned, is here immaterial.   When that mortgage was assigned to the state treasurer as trustee it became the property of the

state regardless of its source or origin. That same section of the Constitution, § 176, which provides that taxes shall be uniform upon the same class of property, provides for the exemption from taxation of state property. The different taxing subdivisions are merely agencies of the state erected and clothed with their various powers to effectuate the purposes of the state. I can conceive of no ground for holding that the legislature may not constitutionally provide that tax liens, subsequently created and belonging to the state, through its agencies, shall be subordinate to other liens which it has directly acquired and holds upon the same property. Indeed, it has been held under constitutional provisions almost identical with our own that such is the result independently and in the absence of legislative enactment. See Public School v. Trenton, 30 N. J. Eq. 667. See also Chicago v. People, 80 Ill. 384.

Surely an enactment providing that mortgage liens on real property, owned by the state should be superior to the liens of subsequent taxes would be wholly consistent with the constitutional exemption of state property from taxation and supported by the same underlying reasons. While property on which the state has liens by way of mortgage is in private ownership it is subject uniformly with other like property to taxes imposed by and through governmental agencies, though the law may subordinate such taxes to the state's other liens thereon. And so, when such mortgage liens owned by the state are foreclosed and ripen into title in the state, we can see no reason for holding that there is any violation of the uniformity clause because the legislature enacts that the title thus acquired is superior to the tax liens held by the state. Such enactment attains exactly the same end after the state acquires title as might have been insured before when the state had only a lien by mortgage.

Much is said in the majority opinion about profit and loss to the bond fund should one construction or the other be given to the statute here under consideration. It seems to me that whether or not the operation of this statute will result in profit or loss to the fund has nothing to do with the question to be determined. Such an inquiry might be pertinent and proper in ascertaining the purposes actuating the enactment, but it is not in passing upon its constitutional propriety.

· I think that the complaint was in all respects sufficient and the demurrer should have been overruled.

### On Petition for Rehearing.

BIRDZELL, Ch. J. . In a petition for rehearing counsel call attention to those portions of the opinion wherein it is stated, in substance, that the power to enforce the lien represented by the tax certificate owned by the county may be suspended during the period that the property is owned by the state without affecting the validity of the lien or the right of the county to realize upon it against a subsequent purchaser of the property. It is suggested that the rights of the county as the holder of the tax certificate should be more definitely determined and stated. In view of the fact that the action is one to quiet title, we deem it proper to fully define the rights of the county as a lien holder. We are of the opinion that the lien of the county is unenforceable during the time the property is owned by the state and all remedy, including the acquisition of title by tax deed, is suspended. We are further of the opinion that the certificate of tax sale, in the absence of any subsequent legislation affecting it, continues to draw interest at the existing statutory rates. The rights of the county as thus defined may be asserted against a purchaser of the property from the state. The reasons supporting these conclusions having already been sufficiently stated in the original opinion, repetition is unnecessary. Rehearing denied.

CHRISTIANSON, BURKE, and BURR, JJ., concur.