[Civil No. 3107.  Filed June 16, 1931.]

[300 Pac. 175.]

STATE ex rel. K. BERRY PETERSON, Attorney General, Appellant, v. COUNTY OF MARICOPA and JOHN D. CALHOUN, as Treasurer of the County of Maricopa, Appellees.

Mr. K. Berry Peterson, Attorney General, and Mr. Charles L. Strouss and Mr. J. R. McDougall, Assistant Attorneys General, for Appellant.

Mr. Dudley W. Windes, for Appellees.

LOCKWOOD, J.—The state of Arizona, hereinafter called plaintiff, filed a complaint in the superior court of Maricopa county, alleging that it had been

since December 19, 1930, the owner in fee simple and entitled to the possession of certain premises in Maricopa county, described as "the South Half (½) of the Southwest Quarter (¼) of Section Two (2), Township One (1) South, Range Three (3) West of the G. & S. R. B. & M."; that the defendants, the county of Maricopa and John D. Calhoun, as treasurer of said county, claimed a lien against said premises for the payment of certain taxes thereon, and, unless they were paid, defendants would sell the premises in satisfaction of the alleged lien thereon.

Plaintiff claimed that by reason of section 2, article 9, of the Constitution of Arizona, said property was exempt from taxes and from sale for the purpose of enforcing a tax as being state property, and that any tax lien that might have existed against the property when the state became the owner thereof merged in the state's superior title in fee. The prayer of the complaint was that the legal rights and status between the parties in respect to the property be adjudicated and that the alleged tax lien be held to be void.

The answer set up that there were regularly assessed and levied against said property before plaintiff acquired title thereto state and county taxes for the years 1918 to 1929, inclusive; that plaintiff had acquired its title to the property in the year 1930 through foreclosure of a mortgage held by it as security for money loaned and purchase at a judicial sale under such foreclosure, and prayed that the court adjudge the tax lien to be superior to the title of the state so acquired. Judgment was rendered in favor of defendants, and from the judgment this appeal was taken.

While it is not so entitled, apparently this suit is based on the Declaratory Judgments Act (sections 4385–4390, Revised Code 1928), and seeks for a de-

termination as to whether taxes duly assessed and levied against property in private ownership and delinquent at the time of the purchase by the state at a judicial sale under foreclosure of a mortgage held by it are a lien upon said property after its purchase as aforesaid.

We have held in the case of *Steinfeld* v. *State,* 37 Ariz. 389, 294 Pac. 834, that a mortgage held by the state is a lien subordinate to a tax title in the hands of a *bona fide* purchaser at a tax sale made before the state had foreclosed its mortgage lien, notwithstanding the provisions of section 2, article 9, *supra.* This decision, so far as that feature of it is concerned, is based on the fact that a mortgage does not, under the law of Arizona, confer any interest in the land covered by the mortgage, and for that reason the taxes under which the land in the case cited was sold were not levied on state property.

In the present case, however, an entirely different situation presents itself. There are no equities or vested rights of an innocent purchaser to be considered. It is simply a contest between the right hand of the state, in its capacity as holder of the legal title through a foreclosure sale, and its left hand, in its capacity as tax gatherer, both on its own behalf and that of its subordinate agencies, the county and various school districts or municipalities.

The question is one of first impression in this state, and since, as we have stated, only the rights of the public are concerned, the real test, in the absence of a specific expression in the Constitution or an act of the legislature governing the situation, is one of public policy. There are two rules upon this point found in the decisions; the first that a previously existing tax lien becomes merged in the legal title when the property affected is acquired by the state, and the second that when the property is acquired for any

other than strictly governmental purposes the tax lien still persists, though its enforcement may be suspended. The reasoning which supports the first rule is well set forth in the case of *State* v. *Locke*, 29 N. M. 148, 30 A. L. R. 407, 219 Pac. 790, as follows:

"The exemption granted to the property of the United States is perhaps compulsory; that to the state, all counties, towns, cities and school districts arises from public policy, which repudiates, as being utterly futile, the theory of the state taxing its own property in order to produce the funds with which to operate its own affairs. To tax it would merely require and render it necessary to levy new taxes to meet the demand of those already laid; that the public would thus be taxing itself to produce the money with which to pay to itself the taxes previously assessed, thereby benefiting no one except the officers employed to collect and disburse such revenues, whose compensation would merely serve to increase the burden of this useless and idle ceremony. The object of taxing property is to produce the revenues with which to conduct the business of the state; it is entirely inconsistent with our theory of government for the property of the state to be taxed, or sold for taxes, in order to produce the money to be expended by the state. Such a procedure is but taking the money out of one pocket and putting it in the other. Another consideration, which should not be overlooked, is that if public property, that is to say, property owned by the state, is to be burdened with a tax lien, the public might lose it entirely through oversight or carelessness of its agents in failing to pay the taxes when due, and allowing the same to be sold and the title pass to third parties."

This rule is supported by the cases of *Reid* v. *State,* 74 Ind. 252; *Gasaway* v. *City of Seattle,* 52 Wash. 444, 21 L. R. A. (N. S.) 68, 100 Pac. 991; *Foster* v. *City of Duluth,* 120 Minn. 484, 48 L. R. A. (N. S.) 707, 140 N. W. 129; *City of Laurel* v. *Weems,* 100 Miss. 335, Ann. Cas. 1914A 159, 56 South.

451; *Smith* v. *City of Santa Monica*, 162 Cal. 221, 121 Pac. 920; and perhaps a few others.

The contrary rule is best exemplified by the case of *State* v. *Burleigh County*, 55 N. D. 1, 212 N. W. 217. The court therein reviews the cases just cited by us, and points out that in each of them the property was acquired by the state in its governmental capacity for a governmental purpose. In the North Dakota case, however, the facts were exactly similar to those of the case at bar. The state had loaned money on land in private ownership, taking a mortgage to secure the loan, and had foreclosed the mortgage in order to protect its loan. In distinguishing between the two situations, the court quotes the statement of Chief Justice MARSHALL in *Bank of United States* v. *Planters' Bank of Georgia,* 9 Wheat. 904, 6 L. Ed. 244, as follows:

" 'It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. Thus many states of this Union, who have an interest in banks, are not suable even in their own courts; yet they never exempt the corporation from being sued. The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. . . . The government, by becoming a corporator, lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter'—citing cases''—and then goes on to say: "In our opinion, the considerations that

support the title and right of the state or public corporations in the above cases as against claims based upon prior taxes are not present in the instant case. The property acquired by the state treasurer in trust in the instant case is not acquired for a public purpose. The constitutional exemption was clearly intended to protect property that was acquired for a public purpose. It was placed in the Constitution at a time when restrictions were imposed upon governmental activities in the direction of private enterprise. See section 185 of the state Constitution 1889. When the state engaged in the farm loan business, it was not in contemplation that any real property should be acquired to facilitate the operation of the department. A state reformatory, a school, a waterworks, or an incinerator cannot be operated apart from the land upon which it is located, but the more successfully a farm loan business is operated, the less the likelihood that any real property will ever be acquired. And when property is acquired in the manner directed by the statute, it is to be held temporarily only. The direction is to dispose of it in order to realize its worth as security. Clearly, the underlying public policy which protects public property from the hazards of tax proceedings is not present to any appreciable extent where the property is held temporarily for such a limited purpose. The state, in the end, is not embarrased to any greater extent than private lenders in realizing the full value of the property. The loan was originally made on the basis of the property continuing to be subject to taxation, and there is no just reason why the position of the lender should later be arbitrarily improved, especially when this is done at the expense of a limited group of taxpayers as distinguished from the taxpayers in general. So far as the danger of loss of the property through tax proceedings is concerned, it might well be protected during the period of state ownership by considering the lien dormant; or the possibility of such loss might well be considered as an incidental hazard and within legislative contemplation when the state was directed to engage in the business of loaning money upon terms that made the adequacy

of its security at all times subject to human judgment, business acumen, and foresight.''

Upon consideration of the two rules, we are of the opinion that general principles of public policy in cases where the tax lien has not become a vested right in the hands of a third party are best served by adherence to the rule first above set forth. No matter whether we hold the tax lien or the mortgage foreclosure title superior, it will simply mean that the state takes money out of one pocket to put it in the other. Assuming the property to be worth less than the combined tax and mortgage, if the tax lien is superior, the state, to protect itself on the mortgage, must pay the taxes and bid in the land. And the money to pay these taxes must be raised by general taxation. If, on the other hand, the foreclosure sale to the state takes precedence, its general tax fund loses the anticipated revenue, and it must presumably levy a new tax to make up the loss. Under either theory, if the land is worth less than the combined tax and mortgage, the state gets the land, and, if the deficit is made up, it is by general taxation. If, however, the land be worth more than such tax and mortgage, either a private purchaser will buy, paying enough to cover both items, or the state buys, getting property worth both. Such being the case, there is less expense and delay under these circumstances if, when the legal title is acquired by the state, its equitable lien for taxes merges therein.

We therefore hold that, where the state has foreclosed a mortgage lien, and bids in the property at a judicial sale under such foreclosure, any tax lien then existing and not in the hands of *bona fide* holders other than the state or its agencies merges the legal title thus acquired. The judgment of the superior court of Maricopa county is reversed and the case remanded, with instructions to enter judgment declar-

ing the lien of the taxes described in the pleadings merged in the title acquired by the state under the mortgage foreclosure proceedings.

McALISTER, C. J., and ROSS, J., concur.